5/5/2021

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

MAY 5 2021 AM10:36
FILED - USDC - BPT - CT

Fernando G. IRAZU, *Pro Se;*                          |      Case No.: 3:21cv618(VAB)

*Plaintiff*                                                          |

V                                                                       |

Margarita OLIVA SAINZ DE AJA;                   |

Kevin F. COLLINS;                                          |

*Defendants*                                                     |

**CIVIL COMPLAIN AND INJUNCTION**

## TABLE OF CONTENTS

I. PARTIES...............................................................................................3
    **A.** PLAINTIFF..................................................................................3
    **B.** DEFENDANTS.............................................................................3
    **C.** AGENCY AND CONCERT OF ACTION.............................................3

**II.** JURISDICTION AND VENUE................................................................4

**III.** NATURE OF THE CASE.....................................................................5

**IV.** FACTUAL BACKGROUND OF THE CASE................................................9
    **2009-2010**:   SIMULTANEOUS DIVORCE AND CRIMINAL PROCEEDINGS: EXTORTIVE MANEUVERS...............................................................................9
    **2010-2012**: JUDICIAL PERSECUTION, AND CONCLUSION OF CRIMINAL PROCESS......11
    **2012-2014**: HARDSHIPS AND CHILD SUPPORT OBLIGATIONS TRUST.......................12
    **2015-2016**:   ABUSE   OF   PROCESS,   VEXATIOUS   CLAIM   AND   FRAUDULENT MANEUVERS, COURT-MANDATED STIPULATION....................................................13
    **2017**: ABUSE OF PROCESS AND VEXATIOUS CLAIM, AS WELL AS "DEALING AND WHEELING"........................................................................................18
    **2018-2019**:   ABUSE OF PROCESS AND VEXATIOUS CLAIM, DISQUALIFICATION OF LOCAL JUDGE, UNEMPLOYMENT AND HEALTH ISSUES, CHILDREN'S WELLBEING...21
    **2020-2021**:   ABUSE   OF   PROCESS,   VEXATIOUS   CLAIM   AND   FRAUDULENT MANEUVERS,   VIOLATION   OF   COURT-MANDATED   STIPULATION,   CHILDREN'S WELLBEING.....................................................................................28
    **PRESENT TIME**...............................................................................33
    **SUMMARY TIMELINE**......................................................................35

**V.** CAUSE OF ACTION..........................................................................38
    **CLAIM I:** DAMAGES INFLICTED ON THE PLAINTIFF DUE TO DEFENDANTS' VIOLATION TO APPLICABLE LAW AND COURT-MANDATED STIPULATION.............38
    **CLAIM II:** DAMAGES INFLICTED ON THE PLAINTIFF AS A RESULT OF DEFENDANTS' ABUSIVE, VEXATIOUS, UNETHICAL AND DEFAMATORY ACTIONS.......................40

**VI.** REQUEST FOR RELIEF AND INJUNCTION..........................................43
**VII.** JURY DEMAND..............................................................................44
**VIII.** DECLARATION UNDER PENALTY OF PERJURY....................................44
**IX.** CERTIFICATION..............................................................................44

EXHIBITS

# I.   **PARTIES**

## A. PLAINTIFF

**1.**   The Plaintiff, Fernando G. IRAZU, is a US, Argentinean and Spanish citizen who has been residing in the State of New York since 2017, currently at 210 East 68th Street, 14 H, New York, NY, 10065; and, due to the grave events and circumstances detailed herein, he has established domicile on a permanent basis in his country of origin, at Billinghurst 1656, 2A, Buenos Aires, 1425, Argentina.

The Plaintiff is admitted to practice law in the State of New York, before the US Supreme Court of Justice, and in Argentina.

## B. DEFENDANTS

**2.**   The Defendant, Margarita OLIVA SAINZ DE AJA  ("Ms. Oliva"), is a US and Spanish citizen who has been residing on a permanent basis in the State of Connecticut since 1998, uninterruptedly at 10 Indian Pass, Greenwich, Connecticut, 06830.

Ms. Oliva is the Plaintiff's former wife, and she is a sophisticated international attorney with decades of professional experience, admitted to practice law in the State of New York and Spain.

**3.**   The Defendant, Kevin F. COLLINS  ("Mr. Collins"), is a US citizen born and raised in Bridgeport, Connecticut, whose known domicile is at 1177 Summer Street, #403, Stamford, Connecticut, 06905.

Mr. Collins is a sophisticated family law litigant of several decades before the local courts, admitted to practice law in the State of Connecticut and the State of New York, and he has represented Ms. Oliva before the local courts since 2010.

**4.**   Ms. Oliva and Mr. Collins are collectively referred as "Defendants."

**5.**   The Plaintiff makes express reserve of naming additional defendants.

## C. AGENCY AND CONCERT OF ACTION

**6.**   At all times herein mentioned, Defendants, and each of them, hereinabove, were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the

Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining Defendants. Each of the Defendants aided and abetted, encouraged and rendered substantial assistance to each other in breaching their obligations to the Plaintiff, as alleged herein. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, as alleged herein, each of the Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment o f the wrongful conduct, wrongful goals, and wrongdoing.

## II.    JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

**8.** This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

**9.** This is also an action to redress the deprivation of the Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution, including pursuant to 42 U.S.C. § 1983.

**10.** In addition, the Court has original jurisdiction pursuant to 28 U.S.C. § 1332 (a) (1) and (3). There is a complete diversity of citizenship, and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

**11.** Venue is proper pursuant to 28 U.S.C.§1402 because, at all times relevant, all of the Defendants resided in this district, do have significant links to it, and all of the wrongful acts and/or omissions complained of herein occurred in this judicial district.

### III.   **NATURE OF THE CASE**

**12.**  The civil complain herein is timely filed based on an interrupted course of action from the Defendants encompassing more than ten years, yet with specific grounds triggered last 4/1/2021.

**13.**  This is a case in which the Defendants have resorted to the local legal system as well as others, within and outside the judiciary, to inflict damage on the Plaintiff while benefiting themselves financially, including their ongoing attempt to illegally appropriate his entire patrimony with fraudulent intent –against preexistent agreements and applicable law to the parties– **(CLAIM I *infra*)**, which as a whole has been carried out through plain abusive, vexatious and unethical dealings before local and international courts, when not criminal conduct per federal normative **(CLAIM II *infra*)**.   Acting in concert, the Defendants also relied on their influence within the Town of Greenwich and the State of Connecticut to cause grave damage in the Plaintiff's life.

**14.**  Within such process the constitutional rights of the Plaintiff have been severely hurt, something extensive to his own civil rights, namely:   First, Fourth, Fifth, Sixth, Eight, Ninth, and Fourteenth Amendments of the US Constitution.

**15.**  The aforementioned *"undue process"* started in 2009 with false criminal allegations of domestic abuse and threats that entailed two illegal arrests of the Plaintiff, including police brutality and other illegalities at the hands of Greenwich Police, Connecticut, as well as on-going harassment from firefighters and others within and outside his community.   In 2009, local firefighters in Connecticut were facing a landmark discrimination case at the US Supreme Court of Justice, and Greenwich Police was settling discrimination lawsuits in federal courts for the very same reason.   Although those criminal allegations against the Plaintiff were dismissed and discarded, it took almost three years for him to expunge his record before the criminal system as a *pro se* litigant.

**16.**  In 2009, Ms. Oliva also maliciously put into question the Plaintiff's mental health, even within his very niche-oriented professional circle, among other defamation by the Defendants over the years.   The Plaintiff had to undergo multiple psychological and psychiatric evaluations at the local and international levels, and all of them confirm his mental sanity, standard personality, and peaceful demeanor towards others.   The Plaintiff never represented a peril to others or himself, and more than ten years prove such asseveration.   As lunatic and ludicrous as it may sound, Ms. Oliva falsely argued before the domestic abuse

office at the YWCA in Greenwich –official report– that the Plaintiff was obsessed with the death of President Barak Obama, and the police officers who illegally arrested the Plaintiff claimed to protect the president at the time.  The religious and political beliefs of the Plaintiff and the parties played a relevant role then and going forward.

17.  During 2009-2010 a simultaneous divorce process took place, one in which the criminal angle, restraining and protective orders, unethical delays and influence, as well as similar tactics were used and continue to be used to advance civil claims for financial benefit within civil proceedings.

18.  As further detailed below, the divorce decree of the parties did not consider the criminal allegations against the Plaintiff as grounds for the irretrievable breakdown of their marriage, yet it drew an unusual distinction between them as to their respective countries of origin, as well as their educational and professional background, ignoring the proven facts during the divorce trial that Ms. Oliva became a US citizen through the Plaintiff –he had become a US resident after holding an O-1 Visa for extraordinary abilities–; that she was allowed to remain in this country legally after marrying him in New York City; and that she obtained employment at top-tier English law firm through some of the Plaintiff's acquaintances as well as he supported her law career as a client and with his own expertise and counsel, as well as committed parenting time and effort.   The parties had originally met at Harvard Law School in 1994.

19.  Up to the events igniting this tragedy, the Plaintiff had been an investment banker and international securities lawyer, with a salary of $1,050,000 from HSBC in New York City for the 2007-2008 period.

20.  As a result of this more than a decade-long process, the Plaintiff's good name, honor, reputation, professional career, finances and patrimony have been devastated, his health deteriorated, as well as the relationship with his children curtailed and their overall wellbeing impacted.

21.  It is worthwhile noting that in 2019 the local court honorably ruled that none of the filings, allegations and claims of the Plaintiff have been vexatious, frivolous, or repetitive.   On three distinct and justified occasions a *Petition of Writ for Certiorari* before the US Supreme Court of Justice attests to the aforesaid.  No sanctions, penalties or fees have been imposed against the Plaintiff due to his behavior and performance within core proceedings before the local legal system.

"After a hearing on the plaintiff's [Ms. Oliva's] motion, and ___*after careful review*___ of the history of the pleadings in this case, the court does not find good cause to grant the motion. ... [  ] …. ___*the court does not find that the defendant [Mr. Irazu] has engaged in a protracted pattern of filing numerous intentionally vexatious, frivolous or repetitive motions*___.  The motion is denied." (bold and italics added), Court Order from Honorable Anthony Truglia, Judge, 4/25/2019.

**22.**  As a contentious party counsel, Mr. Collins has resorted to an *"informal process"* within formal legal proceedings upon the following basic strategy:

**(i)** leveraging his access and influence among key personnel of the local legal system, including his personal knowledge of local judges and decades of experience before them;

**(ii)** defamation of the Plaintiff covering three main areas depending on the specific audience:

> **a)** the Plaintiff is an abuser or criminal who got away with crimes and must be informally punished within and outside civil proceedings, as a way to ruin his life and extirpate his professional future and entire patrimony from him;

> **b)** the Plaintiff is a Nazi anti-Semitic from Argentina, South America, and/or a religious fanatic, when proceedings were in fact conducted, influenced and/or reviewed by Jewish judges and key personnel, among others; and/or

> **c)** the Plaintiff is someone who in light of his race and/or origin is inclined to build up and pursue a Civil Rights Lawsuit or similar within federal venue against the Town of Greenwich, the State of Connecticut, and specifically Greenwich Police and/or Firefighters;

**(iii)** unethical professional conduct of various sorts upon dealing with such a defamed father who is acting *pro se*.

"ATTORNEY COLLINS: …if one reads In Re Martin-Tragona, one case almost the repetitiveness of this; everybody is against me because of what I am.  In In Re Martin-Tragona ___*the basis was everything involved is Jewish; the judge is Jewish; the bankruptcy trustee is Jewish, the clerk is Jewish, the lawyers are Jewish … And now this is where we get to where we can't allow for any reason someone like Mr. Irazu to come in to this court and claim that somehow, Judge Heller is against him because he is a Caucasian male, a naturalized U.S. citizen pursuant to, quote unquote, extraordinary abilities under U.S. immigration laws. Born in Buenos Aires, Argentina, South American —*___ THE COURT: ___*I did — I read it.*___ ATTORNEY COLLINS: …I think Judge Heller was a model, a model of neutrality.  And when the other side —somebody's ultimately not going to win.  And just because you don't win doesn't mean that the judge is against you; it means you didn't carry your burden or you didn't have a good case coming in.", (bold and italics added)

Representation of Kevin Collins before Honorable Robert Genuario, Judge, 4/23/2018, pages 44, lines 3-10, 14-22; 48, 6-12.

"ATTY. COLLINS: He can ask the Court, and ***indeed I will ask the Court, to take judicial notice of it in as much it is in the Court's file*** -- THE COURT: ***Right***…." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 105, line 15.

"MR. IRAZU…***The abuse of process has been also claimed by me – because of what I endure[d] in this courthouse*** from different angles and the direct impact that this process had in me professionally and personally cannot be secluded as Mr. Collins wanted for whatever the reasons that he might have to the last twelve or 24 months.  I was one man when I entered this courthouse, not because I wanted --because the other party wanted to have a trial and I am a different man right now professionally, personally, in terms of finances --  career wise, and in the relationship with my kids.  So if --- I never have the opportunity to argue anything here, so ***suddenly I've [been] told no, you go back twelve months but they can go back ten years to argue abusive process. I don't see how my due process is protected and I don't see how I can make my case.***" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 181, lines 1-22.

"ATTY. COLLINS: ***So the problem that we have is is that Mr. Irazu, from what I heard him say, is trying to connect up things that happened many years ago and wants to extrapolate from that information*** -- MR. IRAZU: No. ATTY. COLLINS: ***You know --*** THE COURT: ***Right***." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 184, lines 19-25.

"THE COURT:  You can certainly testify about everything that's happened to you … MR. IRAZU: And -- yes.  And to conclude, he certainly has, as a former head of investment banking at JP Morgan for an entire region and division, a pretty good understanding of what can happen to a professional who is considered like ***a criminal. Mental[ly] insane, and an abuser***.  So -- which [are] the ***allegations that I've been dealing with since my divorce.  And whether Mr. Collins is concerned about protecting certain groups, I have no intention of suing anybody. I could have already done so***.  THE COURT***:  Now, we're not talking about that***. MR. IRAZU:  Okay." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, pages 185, lines 17-18, 186, lines 15-27.

23.  The Plaintiff is a white Caucasian man of Western European origin, born and raised in Buenos Aires, Argentina, thus categorized as Hispanic by Greenwich Police under official ethnic guidelines.  The Plaintiff is Roman Catholic and holds conservative beliefs.  As mentioned, religious and political beliefs represented an issue during the initial arrest of the Plaintiff, the divorce trial of the parties, as well as subsequent legal proceedings.

"COURT:  ***No politics.  No religion***.  Does that make sense to you?", Divorce Trial before late Honorable Dennis Harrigan, Judge, 6/10/2010, page 63.  "Q: Over the last decade, has your husband displayed very ***firm religious commitments***?  A: ***Yes, you have; and they were all shared by me***.", Divorce Trial before late Honorable Dennis Harrigan, Judge, 6/4//2010, page 129.

**24.**   Attending the mechanics before the local legal system, the facts of this case are deeply constitutional in nature, in the sense of perverting a basic sense of justice against substantive and procedural rights according to settled precedents at the federal level.

## IV.   **FACTUAL BACKGROUND OF THE CASE**

**2009-2010:  SIMULTANEOUS DIVORCE AND CRIMINAL PROCEEDINGS: EXTORTIVE MANEUVERS**

**25.**   On 10/1/2009 divorce proceedings[1] were triggered with false criminal allegations of abuse and threats against the Plaintiff that were dismissed, discarded and/or unsubstantiated in two cases via rulings from the district criminal court[2] as well as the opinion from the *Department of Children and Families* from the State of Connecticut and the late divorce trial judge himself (*Harrigan, J*).

**26.**   The parties have three children fruit of their union:  a girl already of legal age (11/4/1998); a boy already of legal age (7/31/2000); and a girl soon-to-be of legal age (5/26/2003).  Please note the headmasters and teachers at the children's schools were informed in advance of their father's impending illegal arrest by Ms. Oliva, and the *Department of Children and Families* conducted a formal investigation extensive not only to the parties and children themselves, but also those same schools and the children's physicians, among others.  As indicated above, the Plaintiff endured multiple illegalities from the Greenwich Police Department as well as others within the State of Connecticut.  In 2009, the Plaintiff suffered a cardiac arrest and was hospitalized in Greenwich Hospital.

**27.**   Please note that one single judge officiated in both criminal and civil proceedings alike as well as entered orders of marital dissolution *(Malone, J)*, yet another one acted as trial judge and executed the divorce decree of 9/1/2010 *(Harrigan, J)*.   There were two prosecutors involved in the criminal process, and the last one was of regional kind exclusively appointed to this case.

**28.**   On 10/6/2009 Ms. Oliva pursued an *ex parte* restraining order to retain sole residence of the family home *pendente lite*, a day after the Plaintiff requested financial information in his own home.   The Plaintiff claimed Ms. Oliva's approach was geared at extorting civil benefits, including through constant

---

[1] *DN. FST FA 09-4017497, Margarita OLIVA SAINZ de AJA v. Fernando G. IRAZU*, Superior District Court of Stamford / Norwalk at Stamford, State of Connecticut; *AC 41455, AC 41598* (consolidated *sua sponte* into *AC*
[2] *State of Connecticut v. Fernando Gabriel Irazu*, CRO90165772S and CRO90168728S, Superior District Court of Stamford / Norwalk at Stamford, State of Connecticut.

threats, something she acknowledged under oath at the divorce trial.  In fact, there was no need for a divorce trial –the Plaintiff had proposed private mediation without success–, as long as the Plaintiff had agreed to the core financial bargain in exchange for equal parenting prior to any legal action, which was ignited after her pondering different financial outcomes out of a contentious divorce process –as confirmed by evidence admitted during the divorce trial.

> "Q…. ***Have you threatened with criminal actions your husband every time the issue of the marital house was in dispute over the last several months?*** A ***Absolutely***." (bold and italics added), Testimony of Ms. Margarita Oliva Sainz de Aja, Divorce Trial before late Honorable Dennis Harrigan, Judge, 6/10/2010, pages 96-97.

29.   During 2009 and 2010, Ms. Oliva and the Greenwich Police Department attempted to arrest the Plaintiff for potential violations of a protective order by seeking conflict around custody issues over the parties' minor children. The Plaintiff legally warned the Greenwich Police Department in writing not to commit further illegal activity, and provided evidence of their misdeeds. Various written correspondence on record before the local courts confirm such fact.

30.   In 2010, as a result of State-driven illegalities, the Plaintiff was prompted to act *pro se* during a divorce trial centered on criminal allegations, and the trial judge honorably advised him to get his record expunged *(Harrigan, J)*.  In fact, the Plaintiff freely took the stand during such sort of divorce trial. Although the Plaintiff *pro se* did get his record fully expunged in early 2012 (*Comeford, J)*, the long-lasting damage is irreparable.  As a whole, the Plaintiff disputed the fact of his two illegal arrests to the point of being legally entitled to claim that they never took place.

31.   Both Ms. Oliva and the local court deemed the Plaintiff an outstanding and loving father, respectively, and Ms. Oliva referred to him as a good husband in writing before the court.  The divorce decree considered both parties equally responsible for their marital breakdown, and mandated mutual and flexible co-parenting of the minor children under joint legal custody and equal parenting time. All marital assets were divided in equal stakes. Ms. Oliva received $1 as alimony, and she retained residence of the jointly owned home located at 10 Indian Pass, Greenwich, Connecticut ("the Property") for ten years –instead of five years, as previously entertained in private–, subject to certain premises and in exchange for truthful co-parenting.  The Property was acquired with the fruit of the Plaintiff's exclusive effort in 1998.

"3.a.   The Real Property at 10 Indian Pass, Greenwich, Connecticut is joint owned…. ***On or before April 1, 2021, the year in which the youngest child reaches 18, the parties shall list the property for sale with a real estate broker at the then fair market value of the property***..." (bold and italics added), *Memorandum* of 9/2/2010.

**32.**   Even after the conclusion of the divorce process, the local prosecutor protracted such spurious criminal proceedings, taking into account the divorce trial judge had advised the Plaintiff to get his record expunged and issued a divorce decree in which those false allegations were completely ignored as basis for the irretrievable breakdown of the parties' marriage *(Harrigan, J)*.   Although this injustice came to an end due to the Plaintiff's *pro se* efforts, as a US citizen and without any plea bargain he was still compelled to *"self-deportation"* to his country of origin Argentina.   The criminal process finally concluded once the statute of limitations to potentially sue the Greenwich Police had lapsed, roughly at the end of 2011.   The Plaintiff's health was impacted as a result of these events.

### 2010-2012: JUDICIAL PERSECUTION, AND CONCLUSION OF CRIMINAL PROCESS

**33.**   In late 2010, the Plaintiff quickly complied with all financial orders in excess and requested a clarification to the local court regarding his rights and obligations under the divorce decree. While the Plaintiff was abroad, on 11/22/2010 the district court *(Malone, J)* denied any clarifications; sequestered $27,000 of his exclusive property and designated Mr. Collins as trustee of those funds; as well as modified the $1,000,000 life insurance policy on each of the parties' lives for the exclusive ownership of Ms. Oliva. Mr. Collins quickly assumed the role of contentious party counsel and liaison with some the above-mentioned groups.

**34.**   On 7/29/2011 the Plaintiff was erroneously declared in contempt under *in situ* threats of incarceration for non-existent debts after a *capias* being issued while he was exiled in Argentina, only for the officiating judge to later advise him to appeal his own ruling *(Wenzel, J)*, which concluded with a *Petition for Writ of Certiorari* before the US Supreme Court.

"THE COURT:  I must tell you that that relates to the motion to contempt. That is something that again, right or wrong, I made a decision. And if that's not a good decision, then you have your right to appeal ... [] ... Well, if at any time you think that any decision I make is wrong, you have the right to appeal. ***And if I do make a bad decision, an incorrect decision, I want that to be fixed as much as anyone else. So please, feel free if you need to take an appeal, you should do so. I don't take any offense at that. Many people, many lawyers do it here. I get used to it. Okay?"***, Court Order from Honorable William J. Wenzel, Judge, 2/17/2012.

**35.**   During the fourth quarter of 2011, late professor John Mansfield from Harvard Law School offered the petitioner to sponsor him to complete his doctoral degree in juridical sciences at Harvard University, after the Plaintiff having approached him regarding his potential academic career path, in tandem with some of his past professional experience as well as attendance to a Harvard Law School Alumni Seminar on the subject a few years earlier.   Considering the fall-2012 start for the doctoral program, late professor Mansfield suggested the petitioner to be at Harvard Law School in early 2012 as a Visiting Scholar-Researcher.   It was not possible due to the highly contentious stance from the other side within and outside the legal system, as well as financial constraints pegged to such approach.

**36.**   As stated, in early 2012 the Plaintiff *pro se* had his record fully expunged.

## 2012-2014:  HARDSHIPS AND CHILD SUPPORT OBLIGATIONS TRUST

**37.**   During 2012 and 2013 the Plaintiff faced further litigation and on-going threats of criminal nature, including the eviction from his place of residence and a trial *in absentia* for legal fees, among various other hardships, which prompted his second *"self-deportation"* to his country of origin.

**38.**   While in Argentina in 2014, the Plaintiff underwent a US debt restructuring process and, on 5/7/2014, he established a *Child Support Obligations Trust* before the district court in the amount $250,000 via his equity participation in the Property, all based on a budget exclusively produced by the Defendants –Mr. Collins later refused to produce it under subpoena of the local court and denied it existence on record, which was ultimately admitted as evidence by the court.[3] The Plaintiff returned to the US at the end of 2014.

> "ATTY. COLLINS: … That document is -- I don't know that that's even available to her. […] I don't -- […] *We don't think it really exists* -- […] In short, Mr. Irazu is attempting to -- he's been building this up for the last seven or eight years or so -- But that having said, *she does not have that document so therefore she cannot produce it* [Exhibit # A]…" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, pages 21-22.

---

[3] **Total Budget of $464,840** produced by Ms. Oliva and Mr. Collins, broken down as follows: College Expenses: $216,000. Overall Child-Support (already covered up to **$250,000 via *Child Support Obligations Trust***): $248,840, in turn broken down as follows: Child Support: $85,500; Estimated Non-reimbursable Medical Expenses: $32,000; Sports: $35,000; Camps: $28,000; Private School Tuition: $50,000; Schools, Miscellaneous: $10,200; Insurance Policy of Mr. Irazu until 2022: $8,640. **Total Amount covered per Stipulation of 6/10/2016:  $400,000**.

**2015-2016:   ABUSE OF PROCESS, VEXATIOUS CLAIM AND FRAUDULENT MANEUVERS, COURT-MANDATED STIPULATION**

39. In early 2015 the Plaintiff regained employment in the US as a financial advisor at the Stamford office of Merrill Lynch. Ms. Oliva told the Plaintiff that he did not deserve to work.

40. Regardless of the *Child Support Obligations Trust* per 38 above, in 12/2015 the Defendants sued the Plaintiff for child support, educational support orders, and even welfare. Ms. Oliva is a sophisticated New York and Spanish qualified attorney, a senior partner of various international law firms in New York City, the owner of various real estate properties, and holder of relevant investments and savings.

41. On 2/22/2016, in anticipation to one of the hearings put-off by the Defendants, they handed to the Plaintiff a *Financial Affidavit* with their signature, and falsely represented it had been filed before the local court. Such *Financial Affidavit* appraised the Property at a market price of $1,500,000, listed three other debt-free real estate assets in Europe (two by the Mediterranean Sea), savings, investments, retirement accounts, as well as income as a Partner and Chairman of a division within a top-tier international law firm. Such same *Financial Affidavit* was used as the financial framework of reference, needless to say insofar the *minimum market appraisal* of the Property, to effect the bargain contained in the Stipulation of 6/10/2016 per 43 below.

42. The Plaintiff faced a very hostile working-environment at Merrill Lynch in Stamford, so he resigned from his position and joined Oppenheimer also as a financial advisor in early 2016. Soon after Oppenheimer attempted to preclude the Plaintiff from properly disclosing a lien for legal fees against him in his registration application before the State of Massachusetts –where the company itself had been fined for illegal activity–, and compelled him to withdraw such application under penalty of termination. The Plaintiff argued such a course of action would be an illegality with negative professional consequences. The Plaintiff was in fact terminated and Oppenheimer later compensated him for doing so in late 2016. The Plaintiff's employment record does remain clean.

43. After half a year of delays and rescheduled hearings, while the Plaintiff was unemployed and indebted, the Plaintiff and the Defendants settled all differences through a court-mandated Stipulation last 6/10/2016 (*Tindill, J*). By virtue of this Stipulation, the following was mandated:

"2. ___In full satisfaction of Plaintiff's [Ms. Oliva's] Motion for Contempt #204 and/or any financial claim of any nature whatsoever___, the parties agree that the Defendant [Mr. Irazu] shall no longer be

5/5/2021

responsible to pay Plaintiff [Ms. Oliva] any future or past due contributions for or on behalf of the minor children for child support, childcare expenses, medical expenses, children's activities, real property taxes, legal fees, private school tuition, summer camps and/or automobile related expenses for the minor children, ***among others***." (bold and italics added), *Stipulation* of 6/10/2016.

"3.  Plaintiff [Ms. Oliva] is hereby satisfied with the alimony granted per the Memorandum and renounces entirely to seek any modification on the subject.", *Stipulation* of 6/10/2016.

"4.  ***In consideration*** of the provisions of Paragraph 2 and 3 as set forth hereinbefore, ***the Defendant [Mr. Irazu] hereby*** <u>***agrees that he will pay***</u> ***to Plaintiff [Ms. Oliva] FOUR HUNDRED THOUSAND ($400,000.00) DOLLARS from*** his distribution of net equity <u>***upon the sale***</u> ***of the former marital residence*** located at 10 Indian Pass, Greenwich, Connecticut (the "Property"), ***all pursuant to Memorandum***." (bold and italics added), *Stipulation* of 6/10/2016.

 "5.  Subject to the proviso per 10 below, Plaintiff [Ms. Oliva] hereby acknowledges that Defendant [Mr. Irazu] by virtue of the terms set forth hereinbefore, shall be deemed to have ***satisfied in full all financial obligations set forth in this Stipulation and the Memorandum, and Defendant [Mr. Irazu] shall have*** <u>***no further obligation to pay any sums to Plaintiff [Ms. Oliva]***</u>." (bold and italics added), *Stipulation* 6/10/2016.

"6.  As of the date hereof, the ***Defendant [Mr. Irazu] represents that*** <u>***he relies upon Plaintiff's [Ms. Oliva's] representation regarding the tenets of co-parenting and that both parties will fully abide by said standards going forward***</u> …." (bold and italics added), *Stipulation* of 6/10/2016.

"8.  The Plaintiff [Ms. Oliva] is hereby obliged to pay for and maintain in effect the <u>***insurance policy***</u> on the life of the Defendant [Mr. Irazu] <u>***for the exclusive equal benefit of the party's three (3) children***</u> until the youngest child attains the age of twenty-three (23) years." (bold and italics added), *Stipulation* of 6/10/2016.

"10.  The parties agree that if the Defendant [Mr. Irazu] were to have <u>***income as well as financial and patrimonial means comparable to the Plaintiff [Ms. Oliva]***</u>, the Defendant [Mr. Irazu] will assume his equal share of post-secondary educational expenses of their children paid by the Plaintiff [Ms. Oliva]. ***Subject to the prior***, if the Defendant [Mr. Irazu] were not to pay for those expenses, ***the Court shall retain jurisdiction*** over said issue pursuant to C.G.S. §46b-56(c) for all of the three (3) children of the marriage." (bold and italics added),  *Stipulation*, 6/10/2016.

"11.  The ***Plaintiff [Ms. Oliva]*** shall within five (5) days hereof ***pay to the Defendant*** [Mr. Irazu] $20,000 in ***full satisfaction*** of any and ***all claims that he may be have or claim to have*** against the Defendant [Plaintiff]." (bold and italics added),  *Stipulation*, 6/10/2016.

44.  In sum, the Stipulation of 6/10/2016 operated as the updated law as well as new beginning in the parties' post-divorce relationship for the benefit of their children, reinforcing their co-parenting duties per the divorce decree and beyond, as well as settling any and all financial disputes for good as follows:

**(i)**      Taking Ms. Oliva's *Financial Affidavit* per 41 above as well as the Defendants' budget for child support and college-related expenses per 38 above, there was a *minimum market valuation* for the Property of $1,500,000 as well as a specific financial and patrimonial framework of reference to craft the financial provisions of the Stipulation, as explicitly referenced in its provision 10.  Ms. Oliva had requested almost $250,000 for child support and almost $465,000 for all concepts –inclusive of both child support and college-related expenses.  As indicated, in 2014 the Plaintiff had set up a trust for child support with $250,000 from his equity participation in the Property, satisfying in full such demand.

**(ii)**      The Plaintiff then agreed to a *future obligation* to pay $400,000 –increasing his financial commitment from $250,000 in such trust, which would then be dissolved– from his equity participation in the Property, in exchange for Ms. Oliva complying with co-parenting obligations –joint critical decisions in the lives of their children– and the corresponding disbursements therefrom, among others.  Please note it is a future or conditional obligation, *subject to* the other party abiding by her obligations within the core bargain. It is then evident such a figure is inclusive of college related expenses, yet $65,000 short of the rounded amount of $465,000 initially requested by the Defendants for any and all concepts.  As a result, the Plaintiff agreed via provision 10 of the Stipulation to pay half of what Ms. Oliva were in fact to pay for college-related expenses, if he were to have income as well as a comparable financial and patrimonial situation to Ms. Oliva based on her own *Financial Affidavit* –namely, four prized real estate properties, savings, investments and retirement accounts, as well as income as a senior partner of an international law firm.  If the Plaintiff were in such position and refused to pay his dues, then the local court would have jurisdiction to rule on the matter of educational support orders.  The Plaintiff would have loved to be in such situation, which would have implied, mathematically per the Defendants' budget, Ms. Oliva paying very little if nothing at all for the children's college education –indeed, Ms. Oliva's obligation per the Stipulation.  The motivation was for the parties to positively engage in co-parenting, while fostering a peaceful environment in which all can benefit and prosper. Unfortunately, such goal was frustrated by the Defendants and the Plaintiff is not in such comparable situation.  The Defendants know it, the local court knows it, and the prior still pursue their abusive and vexatious claims without constraint before the latter.

**(iii)**      As part of the key bargain all claims of any nature whatsoever against the Plaintiff were settled once and for all.  Even more so, the other party compensated the Plaintiff for him not to sue the Defendants up to 6/10/2016, thus making express mention of their potential liability towards him, not the other way around.

(iv)    In terms of the Property, the core obligation of the parties to dispose it remained the same as in the divorce decree, with the obligation to list it in the market through a real estate broker no later than 4/1/2021 at its then market price. There are no rights of first refusal between the parties. Ms. Oliva is still obliged to maintain and repair the Property, as the exclusive resident, also in light of preserving and enhancing its market value towards the predetermined sale process in time. Since the parties settled all financial issues or debts of any nature or kind, Ms. Oliva then assumed by herself the payment of real estate taxes and mortgage as a whole –both interest and capital.[4]

(v)    Finally, the parties modified the provision in the divorce decree related to the $1,000,000 life insurance policy on the life of the Plaintiff to clarify that its eventual proceeds should be allocated in equal stripes to each of the parties' three children, and Ms. Oliva assumed its cost until 5/26/2026 –already factored in in the Plaintiff's trust from 2014.  Regrettably, in 2015 Ms. Oliva, following Mr. Collins's advice, established a *Revocable Trust Agreement* under which she is the sole trustee and beneficiary of those proceeds, since under such role and per the terms of such trust she can allocate those monies or not to the children, in any way or percentage she might so desire.  The local courts have ignored the Plaintiff's claims as to insurance policy fraud due to this outstanding violation to court orders.

45.  Notwithstanding the clear and unambiguous provisions of the Stipulation of 2016, the Plaintiff was immediately stonewalled in all co-parenting, and deemed dead as far as his parental role is concerned. As a matter of fact, one week after executing this Stipulation, on 6/17/2016, Ms. Oliva sued the Plaintiff for contentious divorce in a concealed and fraudulent fashion in Spain, resorting to false marriage data, domiciles and residences, as well as documentation. The Plaintiff argued the marriage of the parties in New York City of 10/6/1995 in fact took place in Spain, and established the last marital domicile and residences of the parties in Spain –all in one of the properties inherited by Ms. Oliva in this country–, when they had only resided as a couple in the United States and every member of the family is a US citizen despite holding Spanish nationality.   Without such array of falsehoods, under Spanish law proper jurisdiction and competence would have never been activated: Ms. Oliva needed a fraud of international reach to obtain custody orders over minor children under Spanish jurisdiction, as well as improper financial and patrimonial benefits.  Such behavior is punishable under criminal normative at the federal level.[5]

---

[4] There is an outstanding mortgage in the range of $100,000, out of a market valuation of the Property in the range of $1,800,000.
[5] 18 U.S. Code § 1341, § 1342, § 1621, among others.

**46.**  The Plaintiff fortuitously discovered this fraud a year later through official correspondence from the Spanish court sent to the family residence in Connecticut and handed to him by his youngest daughter. The Spanish court had been trying to locate the Plaintiff around the world, while the other party contented she did not know of his whereabouts and requested this foreign court to publish edicts in local newspapers to find him. Via this official correspondence, the Plaintiff discovered the Spanish court had declared him in contempt to court for not answering summons he had never seen or received, set a date for a contentious trial with witnesses, and called for a prosecutor to take part in this process.

**47.**  The Plaintiff *pro se* requested the nullity of such fraudulent proceedings as well as an *exequatur*[6] of the final US divorce judgment and orders, which were granted by the Spanish court in 2017 and 2019.

> "Q: Are you telling me and the Court that you don't know what an exequatur is? A: No, I haven't told you that that I don't know what an exequatur is. Q: You do know? A: *I know what an exequatur is, yes*. Q: You do know? A: Yes. Q:  Okay*. So you know that an exequatur is [an] enforcement of [a] foreign final judgment in a different jurisdiction?  You know that?* A: *I do, yes*.", Testimony of Miss Margarita Oliva Sainz de Aja, Direct-examination, Hearing before Honorable Donna Heller, Judge, 7/11/2017, pages 144-145.

> "Q: So, sir, is not the matter in Spain now proceeding under the exequatur? MR. IRAZU: I filed for an *exequatur* in Granada … I don't know if you're familiar at the international level when and how an exequatur proceeds. But basically this what is extremely [bothering] to me.  An *exequatur* cannot go forward if there is a prior judgment or a subsequent judgment against the -- the judgment that you're pursuing to be enforced. *So if the process that Ms. Oliva started in 2016 had come to a conclusion in Spain, that would have been already a final judgment to ours, I mean the one in this country.  And if that had been the case, I would not have been able to pursue the enforcement via an exequatur of the US orders.  She knows this perfectly well. This is why I was kept in the dark, because as soon as the Spanish court discovered that there was already a judgment, they declared this null and void.* And they did it because I requested an exequatur…" (bold and italics added), Cross-examination of Mr. Fernando G. Irazu, Hearing before Honorable Donna Heller, Judge, 7/13/2017, pages 177-178.

**48.**  Only a month after executing such Stipulation in the United States, on 7/9/2016, Ms. Oliva unilaterally enrolled the oldest daughter for college in Spain –still a minor and already under Spanish jurisdiction due to Ms. Oliva's fraudulent divorce action there–, against court orders, the parties' prior understanding, as well as international normative.

---

[6] *Exequatur* is the normative process under Continental Law carried out before the legal system to register and seek the enforcement of a foreign judgment in another jurisdiction; in this case, the US divorce judgment and orders pertaining to the parties in Spain.

5/5/2021

**49.** On 12/15/2016 the Plaintiff pursued justice alleging fraud and requesting orders of contempt against Ms. Oliva, among others. This motion was amended to reflect the discovery of the Spanish fraudulent and concealed divorce action. Please note the Plaintiff entered into the Stipulation to comply with its terms upon certain premises, conditions and goals, which evidently were not such for the other side. The Plaintiff contends he was induced under false pretenses to execute such agreement for the exclusive financial enrichment of the other side.

**50.** In 1/2017 the Plaintiff once more regained employment with Merrill Lynch as a financial advisor, but this time in its New York Office.

**2017: ABUSE OF PROCESS AND VEXATIOUS CLAIM, AS WELL AS "DEALING AND WHEELING"**

**51.** Mr. Collins, relying on Mr. Jeffrey Diamond ("Mr. Diamond"), Family Caseflow Coordinator of the Superior District Court of Stamford, was able to delay hearings in an unethical fashion for roughly half a year. In 4/2017 the Defendants requested a motion for continuance regarding this party's motion, which was granted via Mr. Diamond, and attempted to preclude the Plaintiff from ever getting to those hearings via a motion for abuse of process and vexatious claim seeking to impose a *"leave to file"* protocol of any and all filings made by the Plaintiff in the State of Connecticut, as well as penalties, sanctions, legal fees and expenses.[7] The Defendants' motion was subsequently restated, argued, and honorably denied by the local court last 4/2019 *(Truglia, J)*. Please note the Defendants were not available for the Plaintiff's hearing on the substantive claims, only for their own attempting to block the prior, and judges were equally available for the latter but not the prior in such order. Then the Plaintiff mirrored the Defendants' claim for abuse of process and all pending motions were going to be addressed at once in 6/2017. Written exchanges among Mr. Diamond, Mr. Collins and the Plaintiff filed before the local courts corroborate the aforesaid.

**52.** In 6/2017 the parties appear before the local district court, but the respective hearing was presumably cancelled for this party having confounded the words plaintiff and defendant in his motion, when up to eight witnesses under subpoena were present before the lower court *(Colin, J)* –only three of those witnesses in the end came back to testify. The court had subpoenaed the Plaintiff's criminal counsel during a portion of the criminal proceedings since he had waived his attorney-client privilege, but he did not

---

[7] On 4/4/2017 the Defendants requested a *"leave to file"* protocol of any filings from the Plaintiff, *in re, Strobel v. Strobel,* 92 Conn. App. 662 (2005) and *in re, Anthony R. Martin-Trigona,* Docket 837534, U.S. Court of Appeals, 2nd. Circuit, 1256 (1984), among similar others, apart from penalties, sanctions, legal fees and expenses.

5/5/2021

appear in court to testify. *Judge Colin* dismissed all present witnesses and asked the Plaintiff to amend his motion and provide a copy of it to Mr. Diamond. A senior litigator before the court had already reviewed the Plaintiff's motion and no relevant objections were noted. On the following working day, Mr. Diamond was nowhere to be found, and the Plaintiff left a courtesy copy of his motion for *Judge Colin* at his chambers. *Judge Colin* now reviewed the motion by himself –in substance the very same motion–, and told the parties to reschedule hearings via Mr. Diamond without delay.

"MR. IRAZU: *I reviewed in the past the motions filed by the other party and they're substantially [in] the same fashion as the one I filed and that you have in front of you today …[…] ---there would always be a technicality that someone can get ahold of to deny rights to someone else*… […] *…I have eight people waiting here …[…]…I'm not sure there's a willingness for this to happen. So this motion 21[3] [for contempt] was informally reviewed by a top attorney in this state* …" (bold and italics added), Hearing before Honorable Thomas Colin, Judge, 6/16/2017, pages 26, lines 4-7; 27, 5-7; 10, 14-15, and 17-19.

"THE COURT: Yes, and this was continued from last week to give Mr. Irazu a chance to resubmit the motion for contempt that I addressed last week in terms of whether the pleadings were insufficient. I did review this over the break and I thank you for getting it here earlier. And it looks to me like the way you structured this is the first section deals with the courts orders. The second section, starting on page 7, deals with the claimed violations of the court orders and each paragraph has a reference to the court orders. And the third section deals with the request that you are making of the court. Does that sound accurate? MR. IRAZU: Yes, Your Honor. Thank you. THE COURT: All right. You know, this is much helpful […] MR. IRAZU: May I respond? THE COURT: You know, I don't think I need a response, sir, because I'm not going --I'm not going to do anything. *I think the motion satisfies --* Mr. IRAZU: Thank you. THE COURT: *--to a material degree what I was getting at last week. In terms of the objections that Mr. Collins is making to the claims for relief, these could be addressed at a hearing on the contempt motion. And the statute involving contempt gives the Court authority to award fees to either sid*e …", Hearing before Honorable Thomas Colin, Judge, 6/19/2017, pages 1 and 4.

"THE COURT: … *In terms of scheduling, I said I was going to address scheduling. I've spoken with Mr. Diamond, the case flow coordinator. I've told him that in my view two days in July,* or was needed, so he's aware of that. I'm going to ask you to go down to the second floor Clerk's office ask for him to come down and he will give you the dates in July, before that July 28[th] date, which I know was an issue dealing with some potential trip out of the country. So you are all set for today. You'll get your hearing dates from Mr. Diamond and they'll be in July." (bold and italics added), Hearing before Honorable Thomas Colin, Judge, 6/19/2017, page 6.

53. Mr. Diamond did not appoint the judge who had asked to schedule those hearings *(Colin, J),* or the judge who ruled on the original Stipulation *(Tindill, J),* rather the one who had volunteered to have this matter *"resolved"* for Ms. Oliva on the record as a result of a prior side parenting issue *(Heller, J)*.

19

"MR. IRAZU:  If I may?  Certainly I am disappointed, which seems to be something recurrent before this place. ***I've been discriminated, persecuted, subject to criminal charges, stolen for [ ] years, threatened to be sent to jail for debts that I didn't have. I didn't have a job.  When I did, I couldn't actually sustain myself and I had this individual filing motions of contempt to court to get fees*** …[…] …  THE COURT:  I have to tell you that I do have to take issue with your statement that you're being discriminated against or not heard in this courtroom. […] As I told you, I'm not making any finding about contempt … […] … It's going to be before the Court in April … […] … ***Attorney Collins, is there anything, any questions*** -- ATTY. COLLINS:  No, Your Honor. I have no -- THE COURT:  -- ***that Miss Oliva has or anything*** -- ATTY. COLLINS: -- the ruling is clear. THE COURT: -- ***to be resolved? Okay***. ATTY. COLLINS: ***Thank you, Your Honor."*** (bold and italics added), Hearing before Honorable Donna Heller, Judge, 2/28/2017, pages 89, lines 10-18; 90, lines17-27; 94, lines 3-10.

**54.**   Those rescheduled hearings finally took place in 7/2017 *(Heller, J)*, and the Plaintiff was precluded from mentioning the word fraud when he had argued that such was in fact the case, in general from offering evidence beyond two years back in time, and from embarking on the overall background of these proceedings. Nonetheless, this party claimed there was sufficient relevant evidence on record to prove his case.  Regrettably, *Judge Heller* had offered herself to have this case resolved for Ms. Oliva; disdained the opinion of the prior judge who ruled on the Stipulation of 6/10/2016 *(Tindill, J)*; provided comfort to the other party on the record in terms of not giving any weight to testimonial and documentary evidence admitted by her, as well as what evidence marked for identification would be finally discarded with the participation of Mr. Collins; and prejudged during a hearing arguing that enough evidence was available and that she wanted to hear a motion for order against the Plaintiff to preclude him from seeking justice ever again and to sanction him. As a result of a court-issued subpoena, insurance policy fraud was also uncovered, among other misdeeds.  A timely motion to open due to fraud was filed and argued to cover all formalities, if any.

"THE COURT: ***Well, what Judge Tindill [the judge who ruled on the Stipulation of 6/10/2016, as well as its extent and meaning] said during some colloquy is not going to be relevant --"*** (bold and italics added) Hearing before Honorable Donna Heller, Judge, 7/13/2017, page 39, line 2.

 "MR. IRAZU: ***And in terms of fraud*** --- ATTY. COLLINS:  I'm going to renew my objection, Your Honor. THE COURT: Okay. MR. IRAZU: No, no, no. That's fine. THE COURT: All right. ***We're not going to talk about fraud.***  If you're not pursuing the fraud claim then we won't use the word fraud. Okay? MR. IRAZU: ***No.***" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 241, lines 8-16.

"MR. IRAZU: ***-- a core issue for me -- in connection with the Stipulation.  So I gave [a] significant amount of money, close to half a million dollars -- in my house in exchange to a very, very large extent, co-parenting -- That has not been the case and that's why I'm here --***

*__Considering this is null and void and actually fraud for other things__*." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/13/2017, page 16, lines 3-17.

"THE COURT: … *__I think your comments go to the weight, not the admissibility__* — ATTY. COLLINS: Yes, Your Honor. […] I do have a relevance objection. THE COURT: Yes. ATTY. COLLINS: I assume that's being overruled on? THE COURT: *__That's -- I think it -- that goes to the weight of --__* ATTY. COLLINS: *__Okay__*. THE COURT: And, yes, it is tangentially -- goes to the relevance but I'm going to allow those." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 102, lines 1-17.

"ATTY. COLLINS*__: And then we can, perhaps, see whether or not this court can do anything with regards to that [fraudulent and concealed divorce claim in Spain], which I doubt that it can.__* […] THE COURT: All right. I'm going to allow the testimony. MR. IRAZU: Thank you. THE COURT: And *__it may turn out that it has no substantial bearing, which of course goes to the weight of the evidence …__* […] But we've got ten minutes before lunch recess…" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 118, lines 8-22.

"MR. IRAZU: *__Isn't it true -- isn't true that …[…] when you are divorced from someone you are already divorced?__* ATTY. COLLINS: *__Objection. That calls for a legal conclusion, Your Honor.__* THE COURT: *__Okay. All right. I'm going to sustain that objection. And I think you need to stay within the scope -- […] -- of the cross-examination.__*" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 159, lines 16-26.

"THE COURT: … I think a lot of the relief you're looking for in this motion *__though you have poached it as a motion to open we have already had extensive evidence on. So I would like to look at that and the other motion that Attorney Collins mentioned [abuse of process (Strobel order)]__* … MR. IRAZU: So I think we seem to be in agreement but it is obviously subject to the outcome. THE COURT:..[…]…*__I'm not going to rule on it today__*." (bold and italics added), Hearing before Honorable Donna Heller, Judge, 11/27/2017, pages 12, lines 1-6; 14, lines 10-11, 16-18.

55. The process to submit post-hearing briefs was unethically delayed for another half a year. The other party didn't argue a single defense to contempt or otherwise. The other side's *"arguments",* as construed by party counsel Mr. Collins, were limited to block the Plaintiff from attaining justice and defamation, aiming at legal fees, sanctions, as well as a potential action for vexatious lawsuit upon a favorable ruling. Not a single defense to contempt to court was argued by them.

### 2018-2019:  ABUSE OF PROCESS AND VEXATIOUS CLAIM, DISQUALIFICATION OF LOCAL JUDGE, UNEMPLOYMENT AND HEALTH ISSUES, CHILDREN'S WELLBEING

56. After various biased hearings, prejudgment, as well as multiple delays and constitutional violations, judgment by the district court was rendered on 3/2/2018 and 5/14/2018 *(Heller, J)*.  The rulings denied and/or ignored all relief sought by this *pro se* father.  *Judge Heller* mirrored the requests from party counsel Mr. Collins, and argued that the Plaintiff should be presumably sanctioned for filing a memorandum in excess of 35 pages with footnotes after him duly alerting the court in writing that such would be the case,

as well as an appendix composed of all relevant official transcripts and *financial affidavits*; for submitting selected evidence and records; and for formally requesting his due process to be respected as well as timely justice be served regarding children.

57.   In her rulings, *Judge Heller* clarified that all court orders were clear and unambiguous and that Ms. Oliva understood them; incurred factual and procedural inaccuracies; deemed all of the violations to co-parenting duties by Ms. Oliva as mere *"communication challenges;"* recouped the Plaintiff's testimony as to him not having spent one week of uninterrupted vacation with his children since 2009, including Christmas, but chose not to mention that Ms. Oliva corroborated such misdeed under oath before her; obviated any mention and relief as to the children not having seen and/or visited their grandmother for many years; ignored credible testimony from respectable witnesses confirming lack of co-parenting from Ms. Oliva in various areas; deemed the fraudulent and concealed divorce action in Spain implicitly legal, when the very same Spanish court declared it null and void, and registered the US divorce judgment through an *exequatur* as a result of this party's original action; justified the Plaintiff for feeling *"outraged"* as to the prior and highlighted Ms. Oliva's *"intemperate and disrespectful"* sayings toward this party; ignored to mention insurance policy fraud, and an illegitimate lien against the Plaintiff with negative professional consequences; disdained the partial nullity of the Stipulation of 6/10/2016; and decided not to grant any relief in terms of custody of the minor children, as well as equitable and financial adjustments, needless to say declare Ms. Oliva in contempt to court for any violation of court orders.

58.   The Plaintiff scrutinized all transcripts and records, and following an objective standard, on 4/24/2018, he unsuccessfully pursued *Judge Heller's* disqualification as well as the transfer of any further proceedings to federal venue *(Genuario, J)*. The officiating judge conceded in a subtle fashion the need to revise judgments under appeal and not via disqualification. After this party's motion for disqualification, *Judge Heller* called for *Family Services* to deal with this scenario for the fist time, and even issued a new judgment though she didn't participate in any further proceedings. The Plaintiff claimed biases and partiality had been objectively proven by clear and convincing evidence.

59.   On 8/29/2018, while awaiting for oral arguments before the local appellate court, Ms. Oliva pursued an *ex parte* petition for relief from abuse at the district court after having attempted to file new criminal charges in Greenwich and visiting the domestic abuse office at the local YWCA without success. Although Ms. Oliva's request was denied on that date *(Sommer, J)*, it was granted from the bench as a one-year civil restraining order last 9/12/2018 *(Truglia, J)*.

**60.**   This order was granted in violation of the Plaintiff's due process, and perpetuated an unequal treatment of this party under the law.   In this sense, commanding precedents have set a balanced test mandating basic requirements of due process to be respected at the time of issuing a restraining order via a proper hearing, and those requirements are not met for the simple fact of holding it.   Utilizing a restraining order as a sword instead of a most needed shield can only occur when due process violations take place.

**61.**   The parties had been living apart for ten years and the Plaintiff had lived in New York City for more than two years without any meaningful interaction, much less any incidents. The effect of this restraining order was to reinforce a *status quo* of contempt to court regarding lack of co-parenting and fraud, as a result of placing the Plaintiff at risk of criminal charges and prosecution in his interaction with the other party, under the same standards that allowed such order to be granted in the first place.

**62.**   No behavior from the Plaintiff vouched for such an order under applicable law, something corroborated by local and out-of-state precedents, also based on reciprocity per comity principles under federal normative. Transcripts prove the requirements to grant this restraining order relied on falsehoods. Subjective feelings are not typified as valid grounds to issue protective orders because they might not be truthful, in sync with reality, and/or have any correlation or proportionality with the objective conduct of the other party.

**63.**   Although the Plaintiff highlighted Ms. Oliva's historical pattern of resorting to measures that can create or actually place the Plaintiff under criminal liability when civil matters are in dispute, he was not allowed to introduce any evidence –fully available to the appellate court– or even to question Ms. Oliva under oath; he was precluded from actually reviewing the spurious evidence admitted by the district court; and the officiating judge didn't scrutinize and take judicial notice of all records proving defamation, falsehoods and ulterior goals in the midst of outstanding proceedings before the appellate court –he did it later on, and honorably so.

**64.**   The district court judge ruled from the bench without any emergency at hand –an *ex parte* application had been denied two weeks prior–, after addressing presumable concerns related to Mr. Peter J. Tesei, Greenwich's First Selectman at the time ("Mr. Tesei"), and the proximity of his residence to Ms. Oliva's –less than 100 yards between them–, as well as the illegalities endured by this party in such location. Please note a few days prior to Ms. Oliva requesting such restraining order, the Plaintiff went to the family residence to pick up his children, and since the house is located in a *cul de sac* he went around it and passed

5/5/2021

by Mr. Tesei's home.[8]  There was a car parked by the family home with someone observing the Plaintiff. By then Ms. Oliva had already visited the Greenwich Police Station and the domestic abuse office at the local YWCA with the goal of filing new criminal charges against the Plaintiff.  Mr. Tesei and the Plaintiff briefly saw each other in the street without any interaction.

65.   Unsuccessfully, last 8/2018, Ms. Oliva attempted to generate inflammatory written exchanges that could facilitate her obtaining an order of this sort.   However, Ms. Oliva was still able to manipulate a harmless single written communication from the Plaintiff, longing for peaceful justice in the legal system within the context of praying for eternal justice at a Christian gathering in church –in fact, protected speech between the parties according to their own shared religious beliefs. The Spanish written words *"injustices are paid"* were deemed by the district court as an implied threat, never an express threat and the *"pattern of threats"* capable of putting a person's life at risk of immediate physical harm, as required per local law.

"THE COURT:  Under oath, when did he send this text?  MARGARITA OLIVA:  So one of them was sent I believe on August 28[th] .  THE COURT: 2018?  MARGARITA OLIVA:  Yes.  THE COURT:  Okay.  MARGARITA OLIVA:  …. basically, the common line here, you have destroyed my life, you have to pay for it.  And this is just very, very disturbing and concerning, Your Honor. THE COURT: *He said you have to pay for it.* MARGARITA OLIVA: *Well, he doesn't say that specifically,* but yeah, in some cases ----- [… ] …THE COURT:  … So I do see texts or the emails and I certainly see how a person might feel that there is an implied threat here; as I said, comma, injustices will be paid for.  MR. IRAZU:  I don't see the translation reflects most likely accurately the Spanish version. So I most likely -- ***it could be the case that they're playing with the words to -- because in other communications simultaneously, at the same time that you don't have, what I said is that I'm looking for justice within the legal system.  There's no threat of any nature whatsoever…[…]…So what I'm trying to say is that the plaintiff [Ms. Oliva] has a history of deceit, fraud, entrapment, provocations that it goes to years.*** THE COURT: *Perhaps she does, sir, but I also have in front of me communications from you, which are very recent, in which I could find, if I were her, unsettling…* […]….THE COURT: ….the issue directly before the Court right now, which is whether there has been a recent pattern of threatening by you with respect to her. *I agree with you that there have been no direct threats, but I do find that the applicant has carried the burden of proof that she has been subjected to a recent pattern of threats.* I think some of the language here does imply -- does carry implied threats that could be unsettling. And -- MR. IRAZU: ***Could you tell me which one? … Because I don't see any threats here.*** THE COURT: Plaintiff's [Ms. Oliva's] Exhibit 2; as I said, injustices will be paid for …. As I said, ***injustices will be paid for.***" (bold and italics added),  Hearing before Honorable Anthony Truglia, Judge, 9/12/2018.

---

[8] The Plaintiff had been threatened with trespassing, among others, if he were to enter into the Property's driveway to pick up or drop off his children, even when sick or injured.  As a result, the Plaintiff had to go around the *cul de sac* to be able to park his car on the street by the Property and then exit it.

66. The restraining order from the district court further detached the Plaintiff from his children, in particular his youngest child who was beginning to face serious health challenges, as well as prevented any potential inspection of his partially owned home. As a consequence, the Plaintiff was not able to pick up or drop off his children at their place of residence, and he couldn't be present in school and religious events, medical emergencies, appointments, and/or any other occasion if Ms. Oliva happened to be there without the joint company of both children residing with her.

67. In 8/2018 the Plaintiff lost his employment with Merrill Lynch-New York due to the energy, effort, resources and time allocated to litigation exclusively generated by the Defendants both in the US and Europe. The Plaintiff had a guaranteed salary of $120,000 per year plus commissions. The Plaintiff could not cope with growing up his business while being consumed by such litigation in two different continents as well as an irresolute pattern of violation to court orders by Ms. Oliva, now seriously impacting the children's wellbeing.

68. Around this time the parties' youngest daughter began undergoing self-cutting and suicidal tendencies, anxiety, panic attacks, and sleep deprivation issues. The Plaintiff was further cutoff from the life of his children, especially his youngest daughter. The Plaintiff began observing this entire situation as if he were a movie spectator without being able to do anything, except receiving some post-facto reports from Ms. Oliva –if any– on her unilateral life-and-death decisions regarding their child.

69. With a restraining order in place, Ms. Oliva began resorting to Greenwich Police and plain entrapment on various occasions. Ms. Oliva invited the Plaintiff to accompany his youngest child at Stamford Hospital for a neurological evaluation, but when the Plaintiff arrived there after driving for almost two hours from New York City, Ms. Oliva informed him that it was not going to be possible for him to see her because she did not feel comfortably leaving the child alone. On a separate occasion, Ms. Oliva invited the Plaintiff to participate in one of the celebratory events prior to their son's high school graduation. After driving several hours from Massachusetts, the Plaintiff was informed he could not enter the premises at some indicated home. If the Plaintiff had complained, he would have been arrested on the spot.

70. In the end, due to such restraining order, only applicable to Ms. Oliva and never children, the Plaintiff could not participate in their son's high school graduation ceremony. In each of those occasions, police personnel and others accompanied Ms. Oliva. Pure acting by Ms. Oliva turned into institutional

entrapment, potential criminal liability, and certainly the curtailment of the Plaintiff's parental rights as well as unjustified damage to the children's wellbeing.

71.   At the federal level it has been ruled that police are not liable for not enforcing the terms of a restraining order that culminated in a violent crime, and federal precedents also exempted the police from liability for not providing around the clock protection to a white family who was harassed by a gang of motorcyclists, a situation that prompted those victims to move out of their home and town –irrespective of discrimination against this family was effectively conceded by the court. Indeed, private security is not part of the police's services. However, in the present case, the facts of those precedents operate in an inverse fashion as long as a father was *"singled-out"* in preparation for and in the midst of long-lasting family proceedings under the premise of protecting a false victim, who has been receiving such *"private security"* in the form of harassing, abusing, provoking, plotting and placing the Plaintiff at risk of entrapment and criminal liability. It is fair to claim the Plaintiff endured an inappropriate *"hostile"* public-related conduct for a variety of identifiable reasons, which also seem to include his religious and otherwise beliefs. The pretext of crime prevention cannot condone criminal activity from third parties and public retaliation for alleging so, much less curtail parental rights and set the stage for a fraudulent scheme in which the Plaintiff loses his entire patrimony to the Defendants.

72.   At the end of 2018 the Plaintiff was rejected by a potential employer, a law firm he would have eventually joined as Senior Counsel with a salary of $250,000 plus a partnership arrangement, due to the remnants of this overall ignominious process.

73.   On 2/12/2019, the appellate court rendered judgment on any and all proceedings without any elaboration *(Alvord, Lavine, Elgo, J)*. The Plaintiff proved through objective records the unequal treatment he was subject to by the lower court after filing and arguing a proper motion to disqualify and transfer any further proceedings to federal venue. A fair trial was not an ingredient of the rulings under review, impacting their constitutional validity, as long as justice is not an issue of venue, popularity, vocal performance and/or perceptions in certain hearing, rather what is due to someone in particular based on the facts of the case, applicable law, and evidence. This has not been the case in these proceedings marked by *"an evil eye and an unequal hand"*, and, therefore, the absence of the rule of law, which implies not only its plain disobedience but in this case doing so through its uneven application.

5/5/2021

74.  *Judge Heller*, a resident of Greenwich, Connecticut, should have recused and/or disqualified herself, and the appellate court ruled on the matter without addressing her performance or any of the issues at hand.  Retaliation for pursuing justice is not sheltered in the United States, and these rulings are in conflict with standards set by federal precedents, some of them unanimous at the Supreme Court level. The lower courts even ignored their own law as to the concept of bad faith and fraud, contempt to court, standards applicable to a *pro se* father when the wellbeing of his children is at stake, as well as suitable equitable and legal remedies in family proceedings.

75.  In fact, the appellate court's discretion was used to conceal and affirm injustice rather than to bring light to relevant issues and advance justice. The appellate court requested *sua sponte* for Mr. Collins, as party counsel, to answer motions or requests filed by the Plaintiff and to submit a brief out of the statutory period; denied this party the standard additional pages to address constitutional concerns; consolidated *sua sponte* the case related to the disqualification of *Judge Heller* only to deny this party the opportunity to submit a separate brief on it; and denied the Plaintiff's request for relief prior to oral arguments, among others.  The interpretation of the law and rules has been one-sided.

76.  The Plaintiff's opinions are rooted in objective matters of fact and law, thus respectfully falling within acceptable standards insofar they give rise to an objective, reasonable belief that the assertions are true, which are protected speech at the federal level. The Plaintiff claims biases and partiality subject to strict scrutiny, never financial corruption or otherwise. All illegalities and defamatory allegations have also been proven at this level, with undisputed evidence and transcripts on record before the local courts.

77.  As mentioned above, on 4/15/2019, the Defendants pursued motions against the Plaintiff for vexatious lawsuit, abuse of process, sanctions, fees and ancillary, which were honorably denied by the local district court *(Truglia, J)*.   The Defendants had restated a motion from 4/2016, when they attempted to preclude the Plaintiff from even making his case before the local court as well as to obtain an order for him not to appear in court ever again, also by relying on the assistance from Mr. Diamond.

78.  On 4/23/2019, the local appellate court, reversing its own prior judgment, issued a new judgment as to the restraining order somehow mandating new proceedings after this party's *Petition for Writ of Certiorari* before the US Supreme Court of Justice, but the parties in fact pursued none as to this matter.

79.  During the period 5-7/2019 the Plaintiff was alerted by the Spanish court that a year prior the other side had initiated another civil action regarding the *exequatur* of the US divorce judgment in Spain

27

without proper documentation.  The Plaintiff was once more compelled to engage in foreign civil litigation, after being kept in the dark for roughly a year, also with a successful outcome in foreign land.

80.   In 8/2019, right before the restraining order was going to lapse, the Plaintiff's mother suffered a cardiac affliction and he was to leave the country for Argentina to take care of her.  The Plaintiff wanted to see his children before his departure, so he called them over the phone and they asked him to pick them up from the family residence.  The Plaintiff explained that was not possible, and told them he would be waiting for them at the gas station a couple of blocks away.  Surprisingly, Ms. Oliva drove the children to the other side of the street, violating the very same restraining order she had requested almost a year before.  In fact, Ms. Oliva had no fear and she didn't need a piece of paper to feel safer; yet she thought a narrative of abuse in the midst of family proceedings would be helpful to her, as much as placing the Plaintiff under the risk of criminal liability to some extent as dictated by the Defendants, as well as the possibility of further detaching him, in such a way, from the daily lives of his children.

### 2020-2021:   ABUSE OF PROCESS, VEXATIOUS ACTION AND FRAUDULENT MANEUVERS, VIOLATION OF COURT-MANDATED STIPULATION, CHILDREN'S WELLBEING

81.   Unemployed, without health care coverage and under such circumstances, the Plaintiff was diagnosed with diabetes in Argentina last 9/2019, and after obtaining Medicaid he was also diagnosed with hypertension in New York City last 2/2020 –the Plaintiff has a history of cardiac arrhythmia and anomalies, aside from a cardiac arrest in the midst of these overall proceedings during 2009.

82.   In 3/2020, the Plaintiff was once again in Argentina due to financial constraints and unemployment, yet this time under lockdown for months as a result of the Covid-19 pandemic.  Knowing of the Plaintiff's whereabouts in Argentina as well as of his professional, financial, patrimonial and health situation, the Defendants unethically sued the Plaintiff for educational support orders in the US last 3/2/2020 –not even a courtesy copy was delivered to him by email–, without jurisdiction under the Stipulation of 6/10/2016 and ancillary, as follows:

"10.   The parties agree that if the Defendant [Mr. Irazu] were to have ***income as well as financial and patrimonial means comparable to the Plaintiff [Ms. Oliva]***, the Defendant [Mr. Irazu] will assume his equal share of post-secondary educational expenses of their children paid by the Plaintiff [Ms. Oliva]. ***Subject to the prior***, if the Defendant [Mr. Irazu] were not to pay for those

5/5/2021

expenses, ***the Court shall retain jurisdiction*** over said issue pursuant to C.G.S. §46b-56(c) for all of the three (3) children of the marriage." (bold and italics added), *Stipulation*, 6/10/2016.[9]

"**DIRECT EXAMINATION BY ATTY. COLLINS:** Q  *Miss Oliva*, good afternoon. Have you had an ample opportunity to review the stipulation dated June 10, 2016, which has been handed up to the Court? A Yes, I have. Q And pointing you to page 2, there's a line above your printed name. Is that your signature? A It is. Q And do you recognize the signature of your former husband, Fernando? A  I do. Q And is that his signature? A Yes. Q  ***Have you had ample opportunity to review this document?***  A  ***Yes, I have***. Q  ***And have I spent enough time with you going over this document, explaining to you all of the details and the ramifications of this agreement?*** A ***Yes, you have***. Q  ***Do you have any questions of me at this point in time relative to this agreement?*** A  ***No***. Q  Have you been satisfied with my representation of you in this matter?  A  Yes, very much.  Q  ***Would you like this Court to take this agreement and make it a court order of -- an order of this Court?***  A  ***Yes, I would***. Q  Okay.  Nothing -- oh, oh -- and ***do you believe it to be fair and equitable under all the circumstances and in the best interests of your children?*** A  ***Yes, I do***. ATTY. COLLINS:  Nothing further, Your Honor.  Thank you."

"THE COURT:  Okay.  ***Ma'am, you understand that if I were to approve this stipulation, what you have agreed to do is mandatory; you must abide by the terms of this agreement***?  MS. OLIVA: ***Yes, I do***. THE COURT:  ***You understand that?***  MS. OLIVA:  ***Yes, I do***. THE COURT:  Okay. Very good.…"

"THE COURT:  Okay.  And ***do you believe that under the circumstances, this agreement is fair and equitable and in Vxxxxxxx, Mxxxxx, and Ixxx's best interests?***  MR. IRAZU:  ***It is in the interests -- the best interests of my children, yes***.  THE COURT:  Okay.  ***Do you have any questions about your obligations under this agreement, sir?***  MR. IRAZU:  ***Not at this point in time, no***. THE COURT:  Okay.  And would you like me to approve it and make it a court order? MR. IRAZU: Yes, I do. THE COURT:  Okay.  ***You understand, once I do that, both you and Ms. Sainz de Aja will be held responsible for the terms of this agreement?  You understand that?***  MR. IRAZU: ***Yes, I do***. THE COURT:  ***Okay.  Do you have any questions for the Court?***  MR. IRAZU: ***No, not – [ …] …-- not* right now**.  THE COURT:  All right.  ***Based on the representations of counsel and the testimony of both the plaintiff [Ms. Oliva] and the defendant [Mr Irazu], the Court finds that the stipulation, dated June 10th, 2016 and signed by both counsel for the plaintiff, the plaintiff [Ms. Oliva], and the defendant [Mr. Irazu], the Court finds that it is fair and equitable under the circumstances and in the three minor children's best interests***.  It is approved and ***so ordered***.  This agreement is ***in satisfaction of the plaintiff's [Ms. Oliva's] motions 204, 204.01, and 204.02***.[10] Okay.  ATTY. COLLINS:  ***Yes, Your Honor.  As Your Honor can see in* paragraph 10, the -- the**

---

[9] "12. The issue of post-secondary educational expenses is not resolved as a result of the terms of this Agreement and the Court shall retain jurisdiction over said issue pursuant to C.G.S. §46b-56(c) for all of the three of the marriage." [such is the wording originally proposed by the Defendants, which contained jurisdiction under the local court on educational support orders, and was amended to its final version after Mr. Irazu agreed to increase his monetary commitment from $250,000 in the above-referenced *Child Support Obligations Trust* (limited to child support and ancillary, not inclusive of college expenses) to $400,000 per provision 4 (including child support, college expenses per provision 10, as well as any financial claim or obligation of any nature or kind whatsoever)], *Previous draft of Stipulation* of 6/10/2016.

[10] Including specific claims regarding post-secondary educational support orders.

*issue of post-secondary education has been deferred.*  THE COURT: Yes.  I see that. MR. IRAZU: *If I may?  Only subject to certain* -- THE COURT: I'm sorry? MR. IRAZU: *It has been deferred, subject to certain specific premises.* THE COURT: *Yes.*   MR. IRAZU: *If not, there is no* -- THE COURT: *Yes.  I see that.* MR. IRAZU: *-- jurisdiction.* THE COURT: *Yes.  Very good. Okay.  Good luck to both of you.* ATTY. COLLINS:  Thank you, Your Honor. MS. OLIVA:  Thank you. THE COURT:  All right.  MR. IRAZU:  Thank you so much.", Hearing before Honorable Erika Tindill, Judge, 6/10/2010.

"After considering all the testimony and documentary evidence admitted and the contents of court file judicially noticed, and having had the opportunity to observe the witnesses, *the court finds by clear and convincing evidence that the plaintiff [Ms. Oliva] had notice of the September 2010 dissolution judgment and the June 2016 stipulation, and that the provisions of the September 2010 dissolution judgment and the June 2016 stipulation are clear and unambiguous.*"  (bold and italics added) Court Order, Honorable Donna Heller, Judge, 5/14/2018.

**83.**  On 3/31/2020, in response to the Defendants' action, the Plaintiff filed a motion to dismiss, a memorandum and affidavits per applicable law, including his updated financial affidavit and a statement under oath as to his professional, financial, patrimonial, and health situation.

**84.**  While the Plaintiff was in Argentina under lockdown in 2020, Ms. Oliva hospitalized the parties' youngest child in an expert facility in Connecticut to treat her for eating disorders, namely anorexia, and precluded the Plaintiff from participating in scheduled family zoom calls with their minor child.  The Plaintiff attempted to smooth the relationship between the parties as much as possible to understand the situation better and hopefully help his daughter, but it came to no avail due to Ms. Oliva's irresolute stance.

**85.**  On 1/1/2021 the Plaintiff was able to return to the US to see his children and seek employment. The Plaintiff did have the chance to see all his children again, two young adults and the minor daughter soon-to-be of legal age who looked like a cadaver as a result of anorexia.  Ms. Oliva once more hospitalized the minor child of the couple due to such affliction, this time in another expert facility near Boston, Massachusetts.

**86.**  On 1/5/2021 a hearing before the district court was conducted due to the Defendants' action of almost a year prior *(Hartley Moore, J).*  As already mentioned, in the end the issue boils down to the Defendants' intent to defraud the Plaintiff by unethical maneuvers within and outside the judiciary in time.

**87.**  The local district court did not have jurisdiction on this matter, if it were not to dismiss the Defendants' action on pure legal grounds.   A *Family Services* meeting took place before the hearing and Mr. Collins falsely attempted to argue the issue was an outstanding debt or arrears from this party regarding

children, when in fact there was and there is none.  The Plaintiff read the applicable court orders and the officer said that he must explain the issue to a judge.  Such very same *Family Services* officer told so on the record to the officiating judge.  However, the Plaintiff was cut-off and unable to provide the full background to, once more, a new judge selected for the occasion.

88.   *Judge Hartley Moore* asked the Plaintiff whether he knew of Mr. Diamond and ordered two days to be scheduled for hearings almost a year away upon Mr. Collins's request.  There was a motion to dismiss before the local court arguing lack of jurisdiction, among others, which legally must be heard beforehand.  The Plaintiff explained the Property was to be placed for sale no later than 4/1/2021 per court orders.  None of it was a relevant consideration to such judge; including the fact the still minor child of the parties was undergoing serious health issues. Furthermore, if the issue was a matter of legal interpretation, as later falsely claimed by Mr. Collins, it is unexplainable why it was deferred for almost another year and two days of scheduled hearings.  Judgment could have been rendered without delay due to the nature of the dispute by simply hearing arguments and taking judicial notice of all records, filings, evidence and relevant transcripts.

89.   On 1/5/2021 the Plaintiff complied with the directives from *Judge Hartley Moore*, and contacted Mr. Diamond to such effect via email.   On this occasion, the Plaintiff also required the other party to cooperate in order to list the Property for sale in the market on or before 4/1/2021 through a real estate broker at the then fair market price, all as mandated by court orders.   The Defendants refused to engage in any dialogue geared at complying with those orders.  Following the instructions of *Judge Hartley Moore,* Mr. Diamond was contacted and copied in all of these exchanges from then on.

90.   On 2/5/2021 the Plaintiff served summons on Ms. Oliva, with copy to Mr. Collins, alleging contempt to court for multiple violations to court orders, including parenting issues, insurance policy fraud, an illegitimate lien, as well as her refusal to cooperate insofar the mandated divestiture of the Property.

91.   The case-detail over the internet reveals Mr. Diamond scheduled the other party's hearings for 9/1-2/2021, and the Plaintiff's motion for contempt and order for 10/14/2021.  An unusual inscription named *"Remote Resolution Plan"* was added alongside this party's scheduled hearing.

92.   On 2/23/2021 the Plaintiff once again contacted Ms. Oliva in writing and via email to comply with court orders regarding the listing of the Property, and attached a comparable market analysis produced by the real estate broker firm of **Coldwell Banker Greenwich** that appraised it in the range of **$1,800,000**.

5/5/2021

**93.**  On 3/1/2021 **Mr. Collins** formally wrote to the Plaintiff indicating that he had secured an appraisal of the Property by an **out-of-Greenwich individual** directed by him for **$975,000**, and argued that this party owed $400,000 to Ms. Oliva as well as college-related expenses never mandated by the court, thus no proceeds were going to be allocated to the Plaintiff upon its divestiture, among others.  Mr. Collins also told the Plaintiff he would be informed of the selected broker by their side in order for him to execute a listing agreement at such base market price.

**94.**    On 3/4/2021 the Plaintiff formally replied to the Defendants in writing and via email indicating the obvious:  the maximization of the Property's value is a goal embedded in court orders for the benefits of all parties.  Pursuant to such orders, Ms. Oliva has the duty to maintain and repair the Property, afford all mortgage payments and taxes, as well as actively cooperate in the sale process.  Thus, she is responsible for any loss in value upon violations to those same orders. The Defendants were also reminded that they had appraised the Property at a market value of **$1,600,000 (2009)** and **$1,500,000 (2016 and 2017)** in their own *Financial Affidavits*, which were used as the minimum financial basis and rationale for the parties to enter into the Stipulation of 6/10/2016.  Indeed, **unless the goal is to defraud the Plaintiff, why will someone cap or limit the market value of such asset in almost half at the time of selling it per court mandate?**  There is no reasonable explanation, albeit plain fraud to extirpate the Plaintiff of his entire patrimony.

**95.**  On 3/5/2021 Mr. Collins formally wrote to the Plaintiff assuming this party was not inclined to sign a listing agreement of the Property at an asking market price of $975,000.

**96.**  On 3/5/2021 the Plaintiff formally replied to the Defendants in writing and via email and attached the **Listing Agreement** with **Coldwell Banker Greenwich** to list the Property on or before 4/1/2021 at an asking market price of **$1,795,000**.   The Plaintiff once again clarified all applicable court orders and addressed the preposterous yet fraudulent approach of the other party, including the role displayed in these illegal maneuvers through and by Mr. Diamond.  The Plaintiff requested his motion, including this subject matter, to be under consideration as soon as feasible to prevent more damages. The Plaintiff requested Mr. Collins to behave ethically, within the boundaries of the law.

**97.**  On 3/30/2021 Mr. Collins formally wrote again to the Plaintiff refusing to list the property for sale in the market at the listing price of $1,795,000, as indicated by the respectable real estate brokerage

firm of Coldwell Banker in Greenwich, this time arguing that such a price could potentially come down if any given buyer were not able to secure a mortgage from a financial institution.

**98.**    On 3/31/2021 the Plaintiff formally replied to the Defendants in writing and via email expressing his consternation, while highlighting the fraudulent scheme pursued by the other side throughout time. In sum, the Plaintiff indicated he was to initiate legal actions due to all of the aforesaid.

**99.**    On 4/1/2021 Mr. Collins wrote to the Plaintiff via email arguing threats and highlighting there is a pending legal dispute until 9/1-2/2021, as well as the risks entailed by potential vexatious litigation.

**100.**    On 4/1/2021 the Plaintiff wrote to the Defendants via email clarifying that he has been the only one subject to threats, and reminded them that the local court honorably denied any of such claims against him in the past, as well as did not impose fees, penalties and/or sanctions against him due to his performance in court. The Plaintiff also clarified that the Defendants in fact compensated him to avoid any lawsuits for any claims up to 6/10/2016 via the court-mandated Stipulation.    The Plaintiff equally clarified that a legal warning is always proper when confronted with criminal and/or overall illegal and unethical behavior.

**101.**    On 4/23/2021 the Plaintiff filed a restated motion for contempt against Ms. Oliva before the local district court due to the other side's blatant disregard for court orders insofar the mandated divestiture of the Property no later than 4/1/2021, to cover any formalities post-facto, if needed.

**PRESENT TIME**

**102.**    In 2009 Ms. Oliva told the Plaintiff that their children were *"collateral damage."*    The Plaintiff did everything possible in his power for that not to be the case. Regrettably, as described above, their wellbeing has been impacted, and since 7/2016 the Plaintiff has seen his oldest daughter on a few occasions for a few hours each, and virtually lost contact with his youngest daughter, who is undergoing serious health issues. The Plaintiff's mother, the only living grandparent of the children and the one who took good care of them when they were little, could not see them together for eight years and then just for a few hours in New York City, and never again. On record, Ms. Oliva's counsel, Mr. Collins, told the district court that the Plaintiff *"can Google grandparents rights."*    All children were minor in 2016 and all are of legal age by now –the youngest child on 5/26/2021–, after being purposely detached from their father and extended family.

5/5/2021

"ATTY. COLLINS: … **_So Mr. Irazu can clearly can – can Google grandparents rights, I suppose_** … But in any event, I think what it all boils down -- this is actually a very narrow motion insofar as what this Court can consider and what's relevant…" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/11/2017, page 48, lines 16-22.

"MR. IRAZU: … **_My mother saw them when they were born, and she acted as a nanny_**. So when she was here […], as an example of it, she saw them twice. **_She was, you can imagine, crying and [emotional] – had to take a pill to be able to sleep. And she only spent with them two hours and a half, two dinners in New York._**" (bold and italics added), Hearing before Honorable Donna Heller, Judge, 7/13/2017, pages 71, lines 22-27; 72, 1.

**103.** Despite the Plaintiff's claims are not moot, it is a fact of reality no court order can bring back the time lost in the lives of the Plaintiff, his children and close extended family, but remedies can serve the purpose of rendering justice. This abusive litigation extends to more than ten years, which includes less than six years since the Defendants filed their vexatious and abusive action last 12/2015; almost five years since their fraudulent and concealed divorce process in Spain last 6/2016; over two years since they unsuccessfully pursued an action for vexatious claim last 4/2020 –seeking penalties, sanctions and legal fees–; as well as more than a year since they filed another vexatious and abusive claim with fraudulent intent last 3/2020, which has been fraudulently put off until 9-10/2021.

**104.** As previously indicated, there was no need for any contentious legal action to accomplish a legal divorce between the parties and to cover the other side's demands. The Plaintiff did all he could for his children, complied with all court orders, and was relentlessly defamed and attacked within and outside the legal system. The Defendants could have accomplished their goals without the assistance of others in the legal system and/or the political sphere in the State of Connecticut, but they did receive such preferential help and/or discriminatory appeasement, as the case might be, when it got to them *"playing the system"* to defraud and damage the Plaintiff, who happens to be unemployed, without any assets except his equity participation in the Property, as well as to undergo health conditions within this decade-long ordeal.

**105.** It is a challenging task to fully apprehend the motivation and disposition in people's minds and hearts, but, when it comes to judging the behavior of the other party, the wellbeing of children is clearly not one of them. The Plaintiff was deemed a loving and outstanding father because he is in fact such kind of parent, and the annihilation of his life has hurt not only himself and his extended family, but first of all his children, either they are capable of understanding it or not at the present time.

5/5/2021

**SUMMARY TIMELINE**

**106.**  To conclude the factual basis, it is worthwhile recapping the situation after more than a decade of legal contentiousness from the other side marked by abuse of process and ancillary, as follows:

**2009**

 -- The Plaintiff underwent two illegal arrests, police brutality, harassment and other illegalities in anticipation for and in the midst of contentious divorce proceedings, all based on false claims and allegations, when in fact there was no real need for any contentiousness to accomplish a fair legal separation and/or divorce.

 -- The Plaintiff was hospitalized due to a cardiac arrest.

 -- The other party obtained a civil restraining order to keep the family residence *pendente lite*, and the criminal angle and similar measures were constantly used as extortive means against the Plaintiff regarding civil benefits.

**2010**

 -- The Plaintiff was compelled to face a divorce trial plagued by criminal allegations without an attorney, since he had resigned because of the "police issue" as well as his desire for an expensive legal process this party could not afford.

 -- Post-divorce trial, the criminal process was still illegally extended by the local prosecutor, and the Plaintiff was compelled to leave the country for Argentina.  This *"self-deportation"* was a requirement for the prosecutor to discard a case he didn't have, yet one he could still delay endlessly.

 -- The Plaintiff complied with all financial orders in the divorce decree in excess, and requested clarifications as to his rights and obligations.  The local court denied those clarifications, sequestered a substantial amount of money from him without any valid reason, as well as appointed Mr. Collins as trustee of those funds, who quickly assumed the role of contentious party counsel.

**2011**

 -- The Plaintiff was declared in contempt to court for non-existent debts while counting on the court-mandated representation of such attorney who had resigned right before the divorce trial. This individual even sued the Plaintiff for legal fees on that same day within the courthouse.  As indicated above, the officiating judge later advised the Plaintiff on record to appeal his own ruling.

**2012**

 -- The Plaintiff *pro se* got his criminal record expunged, also counting on the opinion of the trial judge in the divorce proceedings.

**2013**

   -- The Plaintiff underwent the eviction from his place of residence, among other hardships, and a trial for legal fees *in absentia*.

**2014**

   -- The Plaintiff went through a debt restructuring process from Argentina, and established a *Child Support Obligations Trust* in the amount of $250,000 with his equity participation in the Property, all pursuant to a budget exclusively produced by the Defendants.

**2015**

   -- The Plaintiff returned to the US and found employment, and, regardless of the guarantee via such trust, the other party nonetheless sued him for child support, educational support orders, and even welfare.

**2016**

   -- The Plaintiff was illegally terminated from his employment in connection with a lien on the Property from the above-mentioned attorney, which required proper disclosures to state authorities by him. The Plaintiff argued such employer violated the law, and they finally compensated him for his undue termination. It nonetheless took most of such year for them to do so, and the Plaintiff did retain a clean professional record.

   -- The parties entered into a court-mandated Stipulation, precisely on 6/10, to renew their co-parenting obligations and settle all financial issues. The Plaintiff increased his commitment from $250,000 to $400,000 via his equity participation in the Property, as a *future obligation to pay* when the Property were to be sold and *subject to* co-parenting and financial disbursements by the other side out of such co-parenting, among others. A *Financial Affidavit* provided by the other side was used as a financial and patrimonial frame of reference, including a market appraisal of $1,500,000 of the Property. The other side falsely represented such affidavit had been filed with the court.

   -- A week after the parties entered into such Stipulation, the other side sued the Plaintiff for contentious divorce process in Spain, in a fraudulent and concealed fashion seeking to attain more financial benefits as well as custody rights under foreign jurisdiction. This fraud was fortuitously discovered by the Plaintiff a year later, right before he was to face another trial, this time in Europe.

   -- Less than a month after the parties entered into such Stipulation, the other side unilaterally enrolled the parties' oldest daughter for college in Spain, still a minor and under orders in such foreign jurisdiction due to Ms. Oliva having activated it with fraudulent residences and data.

   -- Since the day after the parties executed the Stipulation, the Plaintiff has been stonewalled as far as co-parenting is concerned.

-- The Plaintiff pursued justice, which was ultimately denied after any imaginable due process violation, including delays and further unethical behavior.

**2017**

-- The Plaintiff regained employment.

-- The Plaintiff successfully pursued the nullity of the foreign divorce process in Spain and requested the *exequatur* of the US divorce process and orders on Spanish soil.

-- A due claim that started in 2016 was extended and delayed for years.  Judgments were rendered in 2018 and 2019.  The Plaintiff also uncovered insurance policy fraud, regarding the $1,000,000 insurance policy on his life, among others, which were all ignored by the local courts.

**2018**

-- While in the midst of proceedings before the local appellate court, the other side pursued a civil restraining order.  Around this time the parties' youngest daughter began experiencing serious health issues.  The Plaintiff was further alienated from the life of her daughter, and subjected to entrapment by the other side to generate criminal liability, all in tandem with the police and others.  Without success, Ms. Oliva had tried to file criminal charges also through the domestic abuse office at the local YWCA when in fact the parties had no meaningful interaction for years and were living in two different cities.

-- The Plaintiff lost his employment due to the efforts, energy, and resources allocated to litigation from the other side in two different continents.

**2019**

-- The Defendants sued the Plaintiff for vexatious and abusive claims in the pursuit of sanctions, legal fees, expenses and ancillary, including a potential court order to preclude him from seeking justice ever again.  This action was denied.

-- The Plaintiff was informed the other side had pursued another civil action regarding the *exequatur* of the US divorce judgment in Spain without proper documentation.  The Plaintiff was once more compelled to engage in foreign civil litigation, also with a successful outcome.

-- The Plaintiff was diagnosed with diabetes and began showing various health afflictions.

**2020**

-- While in Argentina and in the midst of the Covid-19 pandemic, the Defendants sued the Plaintiff for educational support orders, knowing with full certainty that they are not entitled to them under any applicable law and the court-mandated Stipulation executed by the parties last 6/10/2016.

-- The parties' youngest child was admitted in an expert facility due to eating disorders and, while abroad, the Plaintiff was denied access to her by Ms. Oliva.

**2021**

  -- In 1/2021 the other side unethically delayed their own action for educational support orders until 9/2021.  A motion to dismiss had been filed and the local court did not address it.

  -- The parties' youngest child was admitted in another expert facility due to eating disorders and the Plaintiff has experienced this tragedy as another spectator of a movie going from worse to worst.  The Plaintiff has been cutoff from the life of his daughter.

  -- Per court orders, the Property had to be listed for sale in the market via a real estate broker at its then market price on or before 4/1/2021.  The other side refused to do so, even after the Plaintiff provided them with a Listing Agreement from Coldwell Banker Greenwich with a listing price of $1,795,000.  They argued the Property was worth roughly half of that value and they should keep it for themselves.

  -- The Plaintiff is unemployed, without any income, assets, savings, investments and/or retirement accounts.  The Plaintiff is undergoing health issues.  The Plaintiff is compelled to relocate abroad, when it shouldn't be the case.  The Plaintiff's relationship with his children has been curtailed and their wellbeing impacted.

## V.  <u>CAUSE OF ACTION</u>

### CLAIM I:  DAMAGES INFLICTED ON THE PLAINTIFF DUE TO DEFENDANTS' VIOLATION TO APPLICABLE LAW AND COURT-MANDATED STIPULATION

**107.** The Plaintiff hereby re-alleges and incorporates by reference each and every factual allegation above as if fully set forth in detail herein.

**108.** Last 4/1/2021 the Plaintiff and Ms. Oliva had the legal obligation to list the Property for sale in the market via a real estate broker at its then fair market value.  The Defendants knowingly and willfully refused to do so with fraudulent intent.  As previously indicated, the Property was acquired with the fruit of the Plaintiff's exclusive effort.

**109.** Court orders have been deemed clear and unambiguous, known by Ms. Oliva and also attested by Mr. Collins via the Stipulation of 6/10/2016, precisely as follows in their relevant portion:

"3.a. The Real Property at 10 Indian Pass, Greenwich, Connecticut is joint owned.   The wife shall continue to have exclusive possession of the marital residence.  The wife shall pay all monthly expenses of the residence including maintenance and repairs except that the parties shall each pay one-half of the property taxes pertaining to the residence.  ***On or before April 1, 2021, the year in which the youngest child reaches 18, the parties shall list the property for sale with a real estate***

*broker at the then fair market value of the property*. The wife shall also have the right to list the property for sale at any time between the date of the Decree of Dissolution and April 1, 2021 and the husband shall cooperate.    The husband may demand an immediate sale upon the wife's remarriage, or cohabitation without proof of change in finances as required by Conn. Gen. Stat. § 46a-56b.    At the closing of title regarding the sale of the marital residence … any broker's commissions and all normal closing costs shall be paid and the remaining proceeds shall be divided…." (bold and italics added), *Memorandum* of 9/2/2010.

"7.    *All of the obligations by the Plaintiff [Ms. Oliva]* in terms of *necessary repairs, maintenance and payments of mortgage and real property taxes of the Property* shall be in compliance with the terms of the Memorandum." (bold and italics added), *Stipulation* of 6/16/2016.

"2.  *In full satisfaction of Plaintiff's [Ms. Oliva's] Motion for Contempt #204 and/or any financial claim of any nature whatsoever*, the parties agree that *the Defendant [Mr. Irazu] shall no longer be responsible to pay Plaintiff [Ms. Oliva] any future or past due contributions for or on behalf of the minor children* for child support, childcare expenses, medical expenses, children's activities, real property taxes, legal fees, private school tuition, summer camps and/or automobile related expenses for the minor children, *among others*."  (bold and italics added), *Stipulation* of 6/10/2016.

**110.**    Through Mr. Collins and following his advice, Ms. Oliva refused to execute the pertinent **Listing Agreement** with the respectable real estate broker firm of **Coldwell Banker** in Greenwich at the listing price of **$1,7950,000**.

**111.**    Against the clear directives mandating the intervention of a real estate broker to list the Property for sale to third parties in the market, the Defendants resorted to a fraudulent and ludicrous self-directed appraisal of the Property from a related-party outside of Greenwich for $975,000, and finally told this party there was no need to sell it.   They did not want to sell the Property as mandated by court orders, rather keep it to themselves.   And the Defendants told this party so.   There are no legitimate defenses to such behavior, just potential ludicrous excuses in their attempt to justify fraud.   As indicated, only someone with such sort of intent would cap the market value of an asset in almost half when it is time to dispose it in the market by legal command.[11]  No presumable emergency can justify such misdeed.

**112.**    Real estate market conditions have been very favorable in suburbs like Greenwich as a result of the Covid-19 pandemic and the influx of people abandoning urban centers, among others circumstances, including low interest rates and the local real estate market's organic growth.

---

[11] Please note that the so-called fraud triangle of "pressure, opportunity and rationalization" works in a seamless manner from the perspective of the other party.

113.   The illegal behavior of the Defendants does not follow any permissible command or motivation, rather causes further harm on the Plaintiff's life with the ultimate goal of them appropriating his entire patrimony.

114.   General damages as a result of the Defendants' refusal to abide by such legal obligation –also contractual *ab initio* through their private understanding reflected in the divorce decree of 2009 and the court-mandated Stipulation of 2016– are in the range of $1,000,000.

### CLAIM II:   DAMAGES INFLICTED ON THE PLAINTIFF AS A RESULT OF DEFENDANTS' ABUSIVE, VEXATIOUS, UNETHICAL AND DEFAMATORY ACTIONS

115.   The Plaintiff hereby re-alleges and incorporates by reference each and every factual allegation above as if fully set forth in detail herein.

116.   It is a proven fact the Plaintiff never activated the legal system to procure a result that could have been accomplished via private mediation and in a civilized and just manner.   Up to now, the Plaintiff has been compelled to defend himself on *pro se* basis –and to protect his basic rights as well as those of his children– of relentless legal and non-legal attacks form the other side for more than a decade in both the US and Europe, within civil and criminal proceedings plagued by unethical and illegal behavior.

117.   It is also a proven fact that such abusive, vexatious, defamatory and unethical behavior had very negative connotations in the Plaintiff's life, including his health throughout time.   The Plaintiff saw the relationship with his children being curtailed and their wellbeing impacted; his professional career being decimated and his employment terminated because of the time, energy and effort devoted to litigation ignited by the Defendants; as well as suitable employment opportunities being ruined because of the remnants of this overall ignominy.

118.   The Defendants have dragged the Plaintiff through various courtrooms in two continents for many years with the sole purpose of violating the law with impunity, enriching themselves, and inflicting damage on his life. Attempting to achieve a favorable judicial outcome through defamation, unethical professional conduct, as well as plain fraudulent maneuvers represents an improper purpose, which in the present case cannot be construed as any other but malicious in nature, causing great injury due to the humiliation, disgrace and indignity suffered, including emotional distress, as well as grave professional and material harm to the Plaintiff.   Please note that where a lawyer and the lawyer's client are guilty of

coordinated litigation misconduct, it is proper and due for the court to sanction them both and either hold them liable jointly and severally, or allocate or apportion sanctions between them.

**119.**   The professional conduct of Mr. Collins has been critical, essential in all respects, for the Defendants to carry out their misdeeds within the legal system. Such behavior, marked by unethical maneuvers, falsehoods, deceit, concealment, fraud and other crimes cannot be condoned and deemed as proper and valid.   The legal process is not intended for the goals carried out by the other side, also in the fashion pursued by them, and their overall maneuvers are repulsive to any sense of basic fairness.

> "MR. IRAZU: … *As soon as I did this in good faith – this is a document executed by Mr. Collins. So he's part of this fraud*.", Testimony of Mr. Fernando G. Irazu,  Hearing before Honorable Donna Heller, Judge,  7/11/2017, page 53.

> "A: …*We're talking about very serious things, Attorney Collins, that involve you as well, personally.*  I don't think this is entertaining for anybody.  *I'm afraid to say the idea that someone can play with the legal system and get away with it because that person might have an experienced attorney who can get her off the hook, she put it in writing, it's already in evidence, it's troubling to me.*" (bold and italics added), Testimony of M. Fernando G. Irazu, Cross-examination, Hearing before Honorable Donna Heller, Judge, 7/13/2017, pages 191-192.

**120.**   Examples of unethical conduct by Mr. Collins abound:  he was named as trustee by the local court and then converted his role as contentious party counsel; the funds allocated to him in trust were neither properly accounted for nor returned to the Plaintiff when the other party was satisfied of her demands via the *Child Supports Obligation Trust* of 2014 and also the Stipulation of 2016 –double counting–; produced a *Financial Affidavit*, handed it to the Plaintiff, and falsely represented to him that it had been filed with the local court –such *Financial Affidavit* was used to craft the financial provisions and sustain the core bargain of the Stipulation of 6/10/2016–; liaised with outside groups harassing the Plaintiff for years; tried to subvert the proper meaning of a court-mandated agreement before a judge minutes after it was executed by the parties, including himself; used his influence before the local court to block motions, preclude hearings and delay proceedings; prompted witnesses under subpoena of the local court not to appear in court to testify by himself or others; incurred willful falsehoods and misstatements of facts and law; misrepresented the opinion of judges on record; assisted his client in an international fraud punishable under federal criminal normative;  coached his client to commit perjury in multiple occasions as well as to violate court orders with impunity that ended up hurting children, while trying to maintain the appearance of compliance; refused to produce documents subpoenaed by the local court and later denied their existence on record, only for them to be admitted as evidence; engaged in uncountable objections and interruptions just

to disrupt proper questioning and arguments, and to make transcripts completely ineligible; delayed for more than half a year judgment with frivolous motions related to footnotes of post-hearing briefs; incurred defamation against the Plaintiff in various fronts, including on record; filed vexatious motions within a pattern of abuse of process with no other good purpose than harassment and damage in the life of a father acting *pro se,* when not plain legal fees and financial benefit; purposely filed a motion and served it in the US while knowing the Plaintiff was no longer in the country, and didn't even send a courtesy copy by email; willfully and knowingly violated court orders related to the mandated divestiture process of the Property; directed an  appraisal of the Property at half of its true market value and one appraised by the other side in their own *Financial Affidavits*, also attested by him; as a whole violated the rule of candor to the court and the opposing party acting *pro se*;  among various other misdeeds.

**121.**  It could have been somehow possible for the Defendants to accomplish their misdeeds without the assistance or participation from others.  However, Mr. Collins in particular leveraged up his influence with Mr. Diamond as well as his decades of experience before the local courts with judges now confronting a defamed father acting *pro se*.  As the Family Caseflow Coordinator, Mr. Diamond holds a critical function within the Superior District Court of Stamford:  he is in charge of scheduling judges for hearings on family matters, determining their availability and selection, as well as of managing motions for continuance and reviewing various motions.  Through Mr. Diamond, Mr. Collins was able to attain an illegitimate advantage insofar delaying, precluding and obstructing justice, as well as appointing judges to the substantive case predetermined to have the matter *"resolved"* for the other party (*Heller, J,* etc.), among others.

**122.**  Please also note a restraining order by a local judge was granted upon considerations related to the illegalities endured by the Plaintiff in the Town of Greenwich and Mr. Tesei, its former First-Selectman and highest executive officer in charge of the public force within such community (2007-2019), in fact the wealthiest and most powerful in the State of Connecticut.  Mr. Tesei is an acquaintance and neighbor of Ms. Oliva; the Plaintiff's eldest daughter used to work as a nanny for Mr. Tesei's family; and their houses are less than 100 yards apart.  The Plaintiff was questioned in court whether he had any issues with Mr. Tesei and whether there was any particular reason for the Plaintiff to be circulating in Greenwich.

**123**.    As mentioned, it is not proper for a gang of motorcyclists to *"single-out"* and drive-out of their home and town any family, while the police discriminatorily allows for that to happen, but it is illegal and entails liability when the Plaintiff is *"singled-out"* and driven-out of his home and town via State-sponsored behavior, in tandem with the Defendants or not, whatever the motivation might be.

5/5/2021

"MR. IRAZU: …. ***And I also -- I'd like to point out what would [not] be in [a] sane mind after going through two criminal cases, after the spurious allegations of threats, telling me that I would be threatening her again to have something of this sort and that I would be putting my life in the hands of people who abused me,  persecuted me, followed me around town as if I were a peril to the community, and for years. I honestly can't see any peril, Judge.*** THE COURT: ***Sir, you live in New York right now, right?*** MR. IRAZU: ***I do.*** THE COURT: ***So there's no reason for you to come to Connecticut other than to see your children, correct?*** MR. IRAZU: With this [case]. ***I do have friends in Greenwich***. THE COURT: Okay. MR. IRAZU: Okay. THE COURT: ***Do they live across the street from your wife --- ex-wife?*** MR. IRAZU: Say again? THE COURT: ***Do they live across the street from your ex-wife [where Mr. and Mrs. Peter Tesei live]?*** MR. IRAZU: ***No."***, Hearing before Honorable Anthony Truglia, Judge, 9/12/2018.

"THE COURT:  Okay.  Now, sir, you don't' have to fear the police as long as you abide by this order. ***But if you do violate the order, I'm advising you it is a class – potentially a class D felony.*** MR. IRAZU: That's my fear. THE COURT: I know.  So it's very simple.  Don't contact her.  MR. IRAZU: But I have to.  If I'm -- if she contacts me …", Hearing before Honorable Anthony Truglia, Judge, 9/12/2018.

"MR. IRAZU:  So -- and she's still actually working out or [building] up simultaneously in different fronts, ***with the help of different people, to be able to come up with the civil restraining order, which, if this is the standard to grant it, I don't know what will be the standard taken to consider that restraining order broken.  And who will be the person to determine if there is a crime as a result of that, the Greenwich Police Department who arrested me twice illegally and with police brutality? --- Who --- and everything was discovered for what it was.*** So this is the entire background of the case … THE COURT:  I understand that..." (bold and italics added), Hearing before Honorable Anthony Truglia, Judge, 9/12/2018.

**124.**   Based on the aforesaid, the Defendants succeeded in perverting the legal process to their own illegal benefit, also through defamation of all sorts, thus harming the Plaintiff as well as children, all in all while relying on State-sponsored activity for such to be the case.   Third-parties might wonder what could have prompted the Defendants to behave in such a way against the Plaintiff, and the answer is also puzzling to this party: none of it is justified and ill-driven motives are evident, but in the end they have done it because they have been allowed to do so –because they could– without any adverse consequences so far.

**125.**   General damages as a result of the Defendants' behavior are in the range of $5,000,000.

## VI.   **REQUEST FOR RELIEF AND INJUNCTION**

**126.**   **WHEREFORE,** the Plaintiff respectfully pleads the Court to grant the following legal and equitable relief:

**(i)**    For the Defendants to be permanently enjoined from engaging in the unlawful conduct described herein within and/or outside the legal system, as the case might be;

**(ii)**    For general and compensatory damages in an amount according to proof;

**(iii)**    For pre and post-judgment interest on all damages as allowed by law;

**(iv)**    For attorney fees under existing law and costs of suit incurred herein; and

**(v)**    For such other and further relief as the Court may deem just and proper.

## VII.    JURY DEMAND

**127**. The Plaintiff respectfully requires a trial by jury on all issues so triable.

## VIII.    DECLARATION UNDER PENALTY OF PERJURY

**128**.   The undersigned declares under penalty of perjury that he is the Plaintiff in the above action, and that he has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

## IX.    CERTIFICATION

**129**.  The undersigned, Plaintiff in the above action, pursuant to Federal Rule of Civil Procedure 11, certifies to the best of his knowledge, information and belief that this civil complaint:  (i) is not presented for an improper purpose, such as to harass, cause unnecessary delays, or needlessly increase the cost of litigation; (ii) is supported by existing law and non-frivolous arguments for extending, modifying, or reversing existing law; (iii) the factual contentions have evidentiary support within and outside the local courts of the State of Connecticut, and, if specifically so identified, will likely have further evidentiary support after a reasonable opportunity for further investigation or discovery;   and (iv) the complaint otherwise complies with the requirements of Rule 11.

Executed at New York City on May 5, 2021.

By:   Fernando G. IRAZU, *Pro Se*
           *Plaintiffx`*

44